**[Cite as *State v. Remy*, 2018-Ohio-2856.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-6 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-42A |
| | : | |
| CHRISTOPHER C. REMY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of July, 2018.

. . . . . . . . . .

ANDREW P. PICKERING, Atty. Reg. No. 0068770, 50 E. Columbia Street, 4th Floor, Springfield, Ohio 45501
  Attorney for Plaintiff-Appellee

JOSHUA ENGEL, Atty. Reg. No. 0075769, and MARY MARTIN, Atty. Reg. No. 0076298, 4660 Duke Drive, Suite 101, Mason, Ohio 45040.
  Attorneys for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Christopher C. Remy was convicted in the Clark County Court of Common Pleas of ten counts of rape of a child under the age of 13 (less than ten; force or threat of force), eight counts of gross sexual imposition, three counts of intimidation of a witness, three counts of domestic violence, and one count of endangering children; the offenses involved Remy's three young stepdaughters. The trial court sentenced Remy to an aggregate sentence of three consecutive mandatory life sentences without the possibility of parole and classified him as a Tier III sex offender.

{¶ 2} Remy appeals from his convictions, raising the sufficiency and manifest weight of the evidence regarding certain rape convictions, the trial court's determination that the girls were competent to testify, ineffective assistance of counsel, and prosecutorial misconduct during closing argument. For the following reasons, the trial court's judgment will be affirmed.

## I. Background and Procedural History

{¶ 3} The State's evidence at trial established the following facts.

{¶ 4} In November 2012, Remy, who was then 24 years old, met his wife, Tamara; he moved in with her the following month. The two married in March 2013 and resided in the top half of a duplex in Springfield, Ohio. Tamara has three daughters from a prior relationship: D.C., J.C., and K.C. The girls were six, four, and almost three years old when Remy and Tamara married.

{¶ 5} In 2012, prior to Tamara's relationship with Remy, the girls' biological father was sentenced to prison, and Tamara began to rely on "Becky," the then-girlfriend of the girls' paternal grandfather, for assistance with the children. Becky, whom the girls called

"Grandma Becky," babysat the children, often cared for them at her home over weekends, took Tamara to doctor appointments, and the like.

{¶ 6} In late May 2015, while the girls were at Becky's home, J.C. (then six years old) made a suspicious statement to Becky regarding Remy. Becky asked the girls about what was going on, and the girls described sexual abuse by Remy. With the girls' knowledge, Becky recorded the conversation with a voice recording app on her phone (State's Exhibit 1). Becky contacted Kayleigh (the father's sister) and Logan (the father's first cousin) about the girls' allegations; a few days later, Becky emailed or texted a copy of the recordings[1] to Logan and Kayleigh.

{¶ 7} On May 29, 2015, after hearing Becky's recordings, Logan contacted the police, reporting that his three young cousins had possibly been sexually assaulted by their stepfather. At approximately 4:30 p.m. that day, Springfield Police Officer Roger Jenkins responded to Logan's report and met with Logan and Kayleigh. Logan and Kayleigh played Becky's recordings to the officer, who then contacted his supervisor, Sergeant Doug Pergram. After consulting with Jenkins, Pergram called other officers, including Detective Sandra Fent of the Crimes Against Persons Unit, Juvenile Division. Shelby Lowe, a social worker at the Child Advocacy Center (part of Clark County Department of Job and Family Services) also responded to the Remys' residence pursuant to a "rapid response referral" from the police.

{¶ 8} Detective Fent and Officer Jenkins approached the Remys' residence, where they encountered Remy and D.C.; J.C. and K.C. were with family members at Wal-Mart,

---

[1] The conversation was broken into five audio-files, four of which were two minutes and 23 seconds long and the last of which was 29 seconds long.

where Tamara worked. Detective Fent and Lowe decided to interview the girls immediately at the Child Advocacy Center (CAC), and D.C. was driven to CAC. After Tamara and the other two girls returned home, Tamara was asked to drive the girls to CAC.

{¶ 9} Lowe, the CAC social worker, conducted separate forensic interviews of D.C., J.C., and K.C., all of which were video-recorded; Detective Fent watched the interviews from an observation room. While K.C. was waiting and playing in the lobby of CAC, she approached Sergeant Pergram and said, "Chris put his pee hole in my mouth." Pergram informed Detective Fent of K.C.'s statement. After interviewing each child, Lowe referred the children for counseling. Lowe and Detective Fent determined that the girls could not be returned home safely, and the children were placed with the girls' paternal grandmother and her husband.[2] Because K.C. disclosed in her interview with Lowe that sexual abuse had occurred within the past 72 hours, Lowe also referred K.C. to Dayton Children's Hospital for a medical examination.

{¶ 10} That night (May 29, 2015), the grandparents took K.C. to Dayton Children's, where K.C. was interviewed by an emergency department social worker, Belinda Dewberry, and was examined by Dr. Vipul Garg. Dewberry learned from the grandmother that Remy allegedly "put his weiner" in K.C.'s mouth, that Remy had hit K.C.'s head and slammed her on the bed, and that K.C.'s "pee pee hurt"; this information was placed in K.C.'s medical records. K.C. told Dr. Garg that Remy "put his weiner" in her mouth while her mother was at work. K.C. told Dr. Garg that Remy had not put

---

[2] For convenience and clarity, we will refer to the grandmother and her husband as "the grandparents," grandmother, and grandfather, because the girls' biological paternal grandfather was not involved in the case.

anything in her vagina.

{¶ 11} Lowe re-interviewed the girls on Monday, June 2, 2015; these interviews were also video-recorded, but the recordings were lost due to system failure. Lowe testified that, at these interviews, the girls acted shy, had no eye contact, looked down, and did not want to talk. Lowe later learned that the girls had been told by Tamara to act scared and shy during the interview.

{¶ 12} All of the girls displayed disruptive and/or sexualized behaviors after their removal from the Remys' home. The grandparents described, for example, lying, stealing of jewelry (all girls), unlocking of doors at night, masturbation (J.C.), defiance (J.C.), and urination on the rugs and furniture (particularly J.C., but sometimes K.C.). In August 2015, the girls informed Lowe that Tamara had told them at visitation to be "bad" at the grandparents'; the grandmother testified that many of these behaviors improved when visitation stopped. In addition, J.C. displayed sexual behavior around males and mimicked oral sex when eating bananas and using straws. J.C. and K.C. put their fingers in the rectum of one of the grandparents' dogs. D.C. would not wipe after a bowel movement and displayed a lack of self-awareness regarding her body. K.C. once smeared feces on the wall and D.C.'s possessions. In August 2015, the grandparents learned that J.C. was sexually assaulting her sisters.

{¶ 13} D.C. and K.C. have remained with the grandparents since their removal. D.C. and K.C. have received therapy at Rocking Horse Center with different counselors. J.C. was placed in foster care after the grandparents learned of her actions toward her sisters. J.C. had behavioral issues at her first foster placement, and in October 2015, she was placed with a couple who run Oesterlen Respite and Resource Center, a short-

term foster care facility; J.C.'s behavior significantly improved after that change in foster placement. J.C. has received counseling from Rocking Horse Center and, after her placement in foster care, from Youth Challenges.

**{¶ 14}** Lowe interviewed the girls on two other occasions: (1) on August 25, 2015, after the agency received a "family in need of services" referral, and (2) on October 28, 2015 (J.C.) and November 4, 2015 (D.C. and K.C.), after the agency received new allegations of sexual abuse. Dr. Lori Vavul-Roediger, a Board-certified child abuse pediatrician at Dayton Children's, examined J.C. on October 12, 2015. K.C. and D.C. were examined by Dr. Vavul-Roediger on October 15, 2015.

**{¶ 15}** Remy was ultimately indicted on 27 charges of rape, attempted rape, gross sexual imposition, intimidation, domestic violence, and endangering children. Prior to trial, the trial judge met with each child in his chambers and determined that each child was competent to testify at trial.

**{¶ 16}** During the jury trial,[3] the State presented numerous witnesses, including Becky, Logan, Kayleigh, the responding police officers, Lowe, the children's counselors at Rocking Horse Center, J.C.'s counselor at Youth Challenges, the physicians who examined the children, a social worker at Dayton Children's, Tamara's ongoing case-worker, employees of Clark County Department of Child and Family Services (regarding Tamara's visitation), the grandparents, J.C.'s current foster parents, the children (D.C., J.C., and K.C.), and Dr. James Duffee, an expert in pediatric medicine and pediatric psychology. At the conclusion of the State's case, the State voluntarily dismissed the

---

[3] Remy was tried jointly with his wife, Tamara, who also faced similar charges related to the three children.

sole charge of attempted rape (Count 33).

{¶ 17} Tamara presented her defense following the State's case. She testified on her own behalf, denying the allegations. She also offered the testimony of her grandfather and his teenaged daughter, who lived in the bottom half of the duplex where the Remys lived. Tamara's sister also testified on Tamara's behalf. All of Tamara's witnesses indicated that they neither saw nor heard any indication of sexual abuse by the Remys. Remy then testified on his own behalf, denying the allegations.

{¶ 18} After deliberations, the jury found Remy not guilty of one count of gross sexual imposition, but found him guilty of the remaining charges.[4] Remy received an aggregate sentence of three consecutive mandatory terms of life in prison without the possibility of parole. (*See* Appendix for a chart of Remy's offenses and sentences.)

{¶ 19} Remy appeals from his convictions, raising five assignments of error. We will address them in an order that facilitates our analysis.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 20} In his fourth and fifth assignments of error, Remy claims that certain rape convictions were based on insufficient evidence and were against the manifest weight of the evidence, because the testimony of two of the victims (D.C. and J.C.) did not establish penetration. (There were no counts of anal or vaginal rape with respect to K.C.) The counts at issue are Counts 2, 3, 4, and 5 (D.C.) and Counts 16 and 17 (J.C.). Remy does not raise a sufficiency or manifest weight of the evidence argument with respect to his other convictions.

---

[4] Tamara Remy was convicted of rape, complicity to commit rape, three counts of gross sexual imposition, three counts of intimidation of a victim/witness, and three counts of endangering children.

{¶ 21} A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law.  *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 22} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."  *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion").  When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 23} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses.  *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).  The fact that the evidence is subject to different interpretations

does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 24} In reviewing challenges based on the sufficiency and/or manifest weight of the evidence, we are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284; *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 16, citing *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 95 (2d Dist.).

{¶ 25} R.C. 2907.02(A)(1)(b), the rape statute at issue, states: "No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies: * * * (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

{¶ 26} The term "sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶ 27} We have clarified what evidence is legally sufficient to establish vaginal and anal penetration:

Rape, both vaginal and anal, requires intercourse involving penetration of a particular bodily cavity. A "cavity" is a hollow space within

a mass. Webster's Third International Dictionary. Intercourse occurs with penetration of the cavity, "however slight" that penetration may be. R.C. 2907.01(A). Evidence of penetration differs for these purposes, however, because there is a significant anatomical difference between those particular bodily cavities.

Anal rape requires penetration of the anal cavity. The anus is the sphincteral muscle in the structure at the base of the alimentary canal called the rectum, which lies below the buttocks. The anal cavity is a hollow that lies within the anus. Penetration of the anal cavity requires entry through the anus. The "however slight" standard in R.C. 2907.01(A) permits a finding that anal intercourse has occurred when there is evidence of some forceful spreading of the anus by the object concerned. A spreading of only the buttocks, which forms no part of the anal cavity, is therefore insufficient for anal rape. [*State v. Wells*, 91 Ohio St.3d 32, 34, 740 N.E.2d 1097 (2001).] However, depending on all the circumstances, it may constitute attempted anal rape. *Id.*

The vagina is the hollow passage leading from the uterus of the female body outward to the exterior genitalia, or vulva, which is comprised of lip-like folds of skin called the labia majora. The term "vaginal cavity" refers to that entire anatomical process and any part of it.

Penetration of the vaginal cavity requires introduction of an object from without, which necessarily implies some forceful spreading of the labia majora. The penetration need only be "slight." R.C. 2907.01(A).

Therefore, if the object is introduced with sufficient force to cause the labia majora to spread, penetration has occurred.

(Footnote omitted.) *State v. Grant*, 2d Dist. Montgomery No. 19824, 2003-Ohio-7240, ¶ 27-30.   *See also State v. Royster*, 2d Dist. Montgomery No. 25870, 2015-Ohio-3608, ¶ 32.

{¶ 28} Remy argues that D.C. and J.C.'s testimony established only sexual contact, not penetration.   Remy states, "D.C. testified that Appellant did not touch 'where the poop comes out' and that all touching was outside and not inside.   J.C. testified that Appellant touched her vagina and butt, but was never asked to elaborate what she meant with those terms.   She did specifically testify that Appellant never touched 'where the poop comes out'."   (Citations to record omitted.)

### *Vaginal and Anal Rape of D.C.*

{¶ 29} Remy was convicted of raping D.C. vaginally and anally with both his penis and his finger.

{¶ 30} At trial, D.C., then nine years old, testified that Remy "put his hand in my pants and touched the front. * * * [u]nderneath my underwear."   (Tr. at 1186.)   When asked to describe what Remy did, D.C. stated, "he slammed his hand five times, slammed it," and she indicated the motion.   (Tr. at 1187.)   D.C. described Remy's doing the same thing to her "butt."   (Tr. at 1196.)   D.C. described Remy's touching her "front" and "butt" as feeling "gross."   (Tr. at 1222.)   D.C. testified that Remy threatened to "whoop" her if she told; D.C. stated that she "got whooped" with a black belt by Remy if she got in trouble.   (Tr. at 1208-1209.)   D.C. stated that she once tried to call 911 when Remy was "in her clothes" and touching her "butt" while she was on the bed in his bedroom, but Tamara

took the phone away. (Tr. 1218-1221). When asked whether Remy had touched her where the poop comes out, D.C. said, "no." (Tr. 1223.) She stated that he hurt her front under her clothes, and that his hand was "outside," not "inside." (Tr. at 1224.)

{¶ 31} However, during her August 25, 2015 interview with Lowe at CAC, D.C. stated that Remy "hurt us *in* our private parts." And, other individuals also testified to statements made by D.C. that revealed that Remy had penetrated D.C.'s anus and vagina with his hand and penis.

{¶ 32} Dr. Vavul-Roediger, a board-certified child abuse pediatrician at Dayton Children's, testified that she examined D.C. on October 15, 2015, after a referral from Clark County Children Services due to reports of sexual abuse. Only Dr. Vavul-Roediger and the Care Clinic nurse were present for the examination. D.C. told Dr. Vavul-Roediger that her stepfather was "hurting" her.

{¶ 33} Dr. Vavul-Roediger testified:

A:     I asked the child what happened with Chris [Remy], and at that time, she spontaneously cupped her hand and motioned it back and forth like this and did that repeatedly while she was saying, he grabbed me with his hand and touched my privates like this and she continued to do this. (Indicating)

Q:     Did you ask her what she meant by privates?

* * *

A:     The child said, right here and here and she used her own finger to point to her genital area and then to her buttock area. She identified both of these areas as what she refers to as her privates.

(Tr. 723-724.)

{¶ 34} Dr. Vavul-Roediger testified that D.C. further disclosed that Remy had "put his private in my mouth" and "put his private in my privates too." (Tr. at 725.) The doctor stated that when she asked D.C. to clarify how Remy put his privates in her privates, D.C. "said here and here, and again she pointed to her own genital and anal areas." (*Id.*) Dr. Vavul-Roediger further testified:

> * * * I asked the child if Chris used his privates to touch her private where she pees once or more than once. She looked rather sad, and she said more than once, lots, and I asked her if Chris used his private to touch her private in the back where she poops once or more than once. She said, a lot, more than once.

(Tr. at 725-726.) Dr. Vavul-Roediger testified that D.C. appeared "anxious and fearful at times" while talking about the abuse. Finally, Dr. Vavul-Roediger testified that, during the physical exam, she took a long Q-tip to touch the inside of D.C.'s vaginal and anal areas; Dr. Vavul-Roediger testified that D.C. told the doctor that Remy "had put his privates inside of her privates and that it was the same places that the Q-tip had been placed when each of the cultures were collected." (Tr. at 733.) D.C. told the doctor that it hurt when Remy did it. (*Id.*)

{¶ 35} Rebecca Hunt, D.C.'s therapist at Rocking Horse Community Health Center, described in detail her therapy sessions with D.C. Hunt testified that, during a session on October 28, 2015, D.C. wore a Teenage Mutant Ninja Turtle mask and "shared that Chris would put his penis in her mouth and then hurt her front with his private parts and hurt her butt with her [sic] private parts. He would also hurt her with his hands." Hunt further described the December 9, 2015 session, stating:

When we were talking about the body parts, it must have triggered a * * * memory for her because she expressed that her hands, face, nose, mouth, and butt have been hurt by Chris by his hands and his feet; and she stated that she was spanked with a belt and spanked by her mom for telling on Chris. She expressed that her butt, vagina, clitoris, and breasts have been hurt by Chris' hands. Child stated that she would silently think that hurts.

(Tr. at 1096-97.)

{¶ 36} D.C. made additional disclosures to Hunt on December 17, 2015. Hunt testified:

The child reported that the first time she was hurt by Chris she was spanked with his hand and then with a belt. The child supports [sic] the sexual abuse did not start until later, around first or second grade. She reported that * * * at first he just used his hand on her front but later put his fingers inside and his private parts on the outside. Child reported hearing a banging sound when her sisters were being hurt.

{¶ 37} Sherri Grimone, the Rocking Horse therapist for K.C., testified that she had a joint session with K.C. and D.C. on October 7, 2015. During that session, K.C. stated that Remy had put his penis in her mouth. Discussing D.C.'s statements during that session, Grimone noted that D.C.'s disclosure was not identical to K.C.'s. Grimone testified that D.C. "stated in therapy that Chris would put his private parts in my mouth and in my front. So she did not say the exact same thing [as K.C.]. D.C. put [']and in my front.[']"

{¶ 38} Upon review of the evidence, including D.C.'s recorded statements to Lowe, the testimony and medical records from Dr. Vavul-Roediger, and the testimony and therapy records of Hunt and Grimone, there was sufficient evidence that Remy not only touched, but penetrated, D.C.'s vagina and anus, both with his penis and digitally. Although the jury could have chosen not to believe D.C.'s statements to others, particularly given her vague and limited testimony of sexual abuse at trial, the jury did not lose its way in finding Remy guilty of Counts 2-5.

### *Vaginal and Anal Rape of J.C.*

{¶ 39} Remy was convicted of raping J.C. based on his digital penetration of J.C.'s vagina and anus.

{¶ 40} At trial, J.C., then eight years old, testified that Remy hurt her "in my private parts" when she lived at Tamara's house. (Tr. at 1402.) J.C. was later asked what Remy did, and she responded that he "touched me on my private parts." (Tr. at 1406.) J.C. identified her "private parts" as "my vagina and my butt," and she stated that Remy touched her more than once with his hand, both outside and underneath her clothing. (*Id.*) J.C. indicated that Remy also touched her breasts. (Tr. at 1407.) J.C. stated that she would tell Remy to stop, but he did not. (*Id.*) When asked if she remembered what it felt like when Remy would touch her on her butt with his fingers, J.C. responded, "Weird." (Tr. at 1408.) J.C. indicated that she did not remember what it felt like when he touched her vagina with his fingers.

{¶ 41} J.C. described that sometimes Remy wanted "to touch my private parts and did not want to use his belt, so he used a glove" on his hand. (Tr. at 1421.) At trial, J.C. denied that Remy touched her "where the poop comes out." (Tr. at 1421.) J.C. testified

that, if she got in trouble, she would get "whooped" on the outside of her clothes with a belt or, if they could not find the belt, with a brush. (Tr. at 1412-1413.) J.C. stated that Remy told her to lie and not to tell about his touching her and that Remy threatened to whoop her if she did not lie. (Tr. at 1413.)

{¶ 42} J.C. had previously made disclosures about Remy's actions toward her. In the audio-recording by Becky, J.C. initially stated that Remy "picked at" her "butt" and caused it to bleed. When asked by Becky if Remy had put his finger in her butt, J.C. responded affirmatively.

{¶ 43} J.C. also made statements to her counselor and a medical doctor that indicated penetration by Remy. On August 19, 2015, J.C. stated at a therapy session with Rayna Jensen that "Chris touched us *in* our private parts." (Emphasis added; Tr. at 1446.) On October 12, 2015, J.C. was evaluated by Dr. Lori Vavul-Roediger. Dr. Vavul-Roediger testified that J.C. made disclosures to her (the doctor) while she (the doctor) obtained a medical history. Dr. Vavul-Roediger testified that when she asked J.C. why she (J.C.) went to live with her "Mammaw and Pappaw" (the grandparents), J.C. "was noted to have a change in sort of her demeanor and became anxious appearing * * * and she stated to me that he was hurting me. They was touching me *in* my private parts." (Emphasis added.) J.C. clarified for Dr. Vavul-Roediger that "they" referred to Remy and Tamara. Dr. Vavul-Roediger testified that she asked J.C. how Remy had touched her, and J.C. responded "with his hands." When asked to identify her private parts, J.C. showed Dr. Vavul-Roediger her breast, genital area, and anal area. The doctor testified that J.C. referred to her breast area as "B," her genital area as "pee pee," and her anal area as "butt." J.C. separately reported to Dr. Vavul-Roediger that Remy "spanked" her

and her sisters.

{¶ 44} In summary, J.C. informed Dr. Vavul-Roediger and one of her therapists that Remy was touching her *in* her "private parts" with his hands, and she identified her private parts as both her vaginal and anal areas. Based on that evidence, the State presented sufficient evidence that Remy digitally penetrated J.C.'s vagina and anus. Upon review of the entire record, we cannot conclude that the jury lost its way when it credited these statements.

{¶ 45} Remy's fourth and fifth assignments of error are overruled.

### III. Competency of Child-Witnesses

{¶ 46} Remy's first assignment of error claims that the trial court "failed to make the required findings to declare the alleged victims competent to testify."

{¶ 47} Evid.R. 601 provides that "[e]very person is competent to be a witness except: (A) [t]hose of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." "If the witness is of unsound mind or under the age of ten, the proponent of the witness bears the burden to establish certain indicia of competency." *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 23.

{¶ 48} When the competency of a child under the age of ten is questioned, the trial court must conduct a voir dire examination of the child to determine the child's competency to testify. *State v. Frazier*, 61 Ohio St.3d 247, 250-251, 574 N.E.2d 483 (1991); *L.N.Y. v. Breh*, 2d Dist. Montgomery No. 26607, 2016-Ohio-966, ¶ 7. "In determining whether a child under ten is competent to testify, the trial court must take into

consideration (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful." *Frazier* at 251; *State v. Jordan*, 2d Dist. Montgomery No. 26163, 2016-Ohio-603, ¶ 34.

{¶ 49} We review the trial court's competency determination for an abuse of discretion.

{¶ 50} On November 14, 2016, the trial court interviewed each of the three child-witnesses, who were six (K.C.), eight (J.C.), and nine (D.C.) years old at that time. The prosecutor and counsel for both Remy and his wife were present, and each had an opportunity to question the children.

{¶ 51} D.C. stated during the in-chambers interview that she was 9 years old and in the fourth grade. She stated that she went to school "on a computer," but might be able to go back to her old school. D.C. named her former teacher and gave an opinion of her. D.C. indicated that she was living with her grandparents, who helped her with her homeschooling, and she identified the street on which she lived. D.C. stated that she had gotten A's and B's in school, "but I never ever got a F" and had never been suspended. D.C. did not know the date or the particular day of the week of the interview, but she indicated that she does not keep track.

{¶ 52} D.C. expressed that she understood the difference between telling the truth and a lie. She stated, "Telling a lie is bad and telling the truth is good. I always tell the truth. * * * Like if I stole a piece of candy, I would say I took a piece of candy, that's what

I did.   I never take candy.   I never take food."   D.C. also stated that she understood what a promise meant, and that if she promised to tell the truth, she would have to tell the truth.   The court made statements about the cleanliness of the windows and the time of day, and D.C. indicated an understanding of which of those statements were true and which were false.

{¶ 53} Counsel asked D.C. about her hobbies and favorite foods.   D.C. stated that she plays soccer with her cousins and her grandfather keeps score.   D.C. stated that her favorite food is apples, which she gets from the store, and that she hates hot dogs.   D.C. stated that she likes hamburgers, and her favorite place to get them is Golden Corral.

{¶ 54} K.C. stated that she was six years old and was wearing a purple dress. She indicated that she was homeschooled, helped by her grandmother.   K.C. told the trial court that she would be in fifth or sixth grade if she attended school.   K.C. named the elementary school she used to attend and her former teacher's name.   When asked her favorite subject, K.C. stated "sometimes I studying homework."   K.C. gave her sisters' names and ages.   K.C. could not name the street on which she lived.

{¶ 55} The court discussed with K.C. about telling the truth and making promises. K.C. stated that she did not need to make a promise before telling the truth.   The court also discussed with K.C. how she had gotten to court, whether she had breakfast, and what she had done the day before.   K.C. told the court she liked to play with dolls, and she described a new doll she had gotten.   K.C. commented that the court had the same kind of computer that she has, and K.C. discussed with the court how to use a computer.

{¶ 56} The prosecutor asked K.C. what she had done over the summer break from school.   K.C. responded that she had gone swimming with her neighbors in the pool at

her house, until the pool was taken down. K.C. explained that the pool was taken down when it started to get cold and leaves started dropping into the pool. Upon questioning from Tamara's counsel, K.C. stated that not playing fair was cheating.

{¶ 57} J.C. told the court her birthday and the date of the interview. She stated where and with whom she lives, and she described how she goes to and returns home from school. J.C. identified the school that she attends and her teacher; J.C. stated that her favorite subject was math. Initially, J.C. responded "no" to whether she knew "what it means to tell a lie." Upon further questioning, J.C. told the court that telling the truth means "that you don't lie," and she indicated whether certain statements by the court (e.g., this paper is blue) were truthful. J.C. stated that a promise means that "you swear that you're gonna take it, do it." J.C. remembered what she had done the prior week, including that she did not attend school one day; J.C. stated that she does not miss school when she is absent and that she did not want to go to school that day. J.C. answered what she had done for her last birthday (in August).

{¶ 58} Later that day (November 14), the trial court filed an entry finding that the children were competent to testify. The entry stated, in its entirety, "The Court having interviewed the three juvenile witnesses, D.C., J.C., and K.C., in chambers with counsel for the parties, find[s] that all three witnesses meet the standards for competency to testify."

{¶ 59} On appeal, Remy acknowledges that the trial court was not required to make specific findings on each *Frazier* factor. However, he claims that there was no evidence that the trial court considered each *Frazier* factor and, in particular, that the interviews of D.C, J.C., and K.C. did not address their ability to observe, recall, and

communicate accurate impressions of past events.

{¶ 60} We disagree. Although the trial court did not question the children about the events related to the indictment, the trial court and/or counsel asked the children about past experiences. D.C. was asked about her past schooling, her hobbies, and her favorite foods, which provided an opportunity for her to talk about her former teacher, playing soccer with her cousins, and where she has eaten or gotten certain foods. K.C. was also asked about her former school and teachers. In addition, K.C. was asked what she had done during the past summer, to which she answered that she had gone swimming until it was too cold and the leaves were falling into the pool. J.C. was asked about her last birthday, which was approximately two months prior to the interview.

{¶ 61} Upon review of the transcript of the interviews with K.C., J.C., and D.C., the trial court did not abuse its discretion in finding that each child was competent to testify at trial. Remy's first assignment of error is overruled.

## IV. Ineffective Assistance of Counsel

{¶ 62} In his third assignment of error, Remy claims that his counsel rendered ineffective assistance by failing to object to the admission of several out-of-court statements by the children regarding the alleged sexual abuse.

{¶ 63} We review alleged instances of ineffective assistance of trial counsel under the two-pronged analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create

a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland* at 688; *Bradley* at 142. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. A defendant is entitled to "reasonable competence" from his or her attorney, not "perfect advocacy." *See Maryland v. Kulbicki*, 136 S.Ct. 2, 5 (2015), citing *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam).

{¶ 64} "*Strickland* and its progeny establish that when a court is presented with an ineffective-assistance-of-counsel claim, it should look to the full record presented by the defendant to determine whether the defendant satisfied his [or her] burden to prove deficient performance." *Reeves v. Alabama*, __ U.S. __, 138 S.Ct. 22, 26, 199 L.Ed.2d 341 (2017). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.).

{¶ 65} Remy claims that his trial counsel rendered ineffective assistance by failing to object to certain hearsay: (1) the audio-recording by Becky, (2) the video-recordings of the CAC interviews of D.C. on May 29, 2015, K.C. on August 28, 2015, and J.C. on October 28, 2015,[5] (3) Sergeant Pergram's testimony about a statement by K.C. at CAC

---

[5] Remy does not expressly challenge the video-recordings of additional CAC interviews. Exhibit 3A contains the video-recorded interviews of all of the children on May 29, 2015, and the video-recorded interviews of K.C. and D.C. on November 4, 2015. In addition, Exhibit 7 contains the video-recorded interviews of all three children on August 28, 2015. Regardless, our analysis of Remy's assignment of error applies equally to all of the CAC video-recordings.

on May 29, 2015, and (4) the grandfather's testimony about a statement by K.C. upon leaving CAC on May 29, 2015. Remy also claims that his counsel should have objected to improper opinion testimony provided by Dr. Duffee, the State's expert.

{¶ 66} In its appellate brief, the State does not argue that Becky's audio-recordings, the video-recordings at CAC, or K.C.'s statements to Sergeant Pergram and the grandfather were admissible under an exception to the hearsay rule. Rather, the State asserts that Remy's trial counsel employed a reasonable trial strategy when he failed to object to the recorded statements, that the grandfather's and Pergram's testimony about K.C.'s statements were not prejudicial, and that Dr. Duffee's statements were neither inadmissible nor unduly prejudicial. We note that, at oral argument, the State asserted the forensic interviews were admissible as statements made for the purpose of medical diagnosis or treatment.

### *Hearsay Rule*

{¶ 67} Evid.R. 801(C) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement," as included in the definition of hearsay, is an oral or written assertion or nonverbal conduct of a person if that conduct is intended by him as an assertion. Evid.R. 801(A). "An 'assertion' for hearsay purposes 'simply means to say that something is so,' *e.g.*, that an event happened or that a condition existed." (Emphasis and citations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 97. Assertions can generally be proven true or false. *Id*. In general, hearsay is not admissible. Evid.R. 802.

{¶ 68} Certain statements are excluded from the definition of hearsay, including

statements of a party-opponent where the statement is offered against that party. Evid.R. 801(D)(2)(a); *State v. Cole*, 2d Dist. Miami No. 2013 CA 18, 2014-Ohio-233, ¶ 36. In addition, there are several exceptions to the hearsay rule, including, for example, present sense impressions, excited utterances, statements of the declarant's then-existing condition (mental, emotional, physical), and statements for purposes of medical diagnosis or treatment.   Evid.R. 803(1)-(4).

{¶ 69} In particular, Evid.R. 803(4) provides that statements for purposes of medical diagnosis or treatment are not excluded by the hearsay rule, even though the declarant is available as a witness.   The rule permits "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."   Such statements are generally deemed to be trustworthy and admissible because " 'the effectiveness of the treatment depends upon the accuracy of information given to the physician [so] the declarant is motivated to tell the truth.' " (Citations omitted.) *State v. Hazel*, 2d Dist. Clark No. 2011 CA 16, 2012-Ohio-835, ¶ 45; *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 71 (2d Dist.).

{¶ 70} Evid.R. 807 also "provides an exception to the general exclusion of hearsay statements when a child under the age of 12 at the time of trial or hearing makes an out-of-court statement describing any sexual act that is performed on, with, or by the child." *State v. Silverman*, 121 Ohio St.3d 581, 2009-Ohio-1576, 906 N.E.2d 427, ¶ 14, citing Evid.R. 807(A).   "For the statement to be admitted, the proponent of the statement must not be able to reasonably obtain the child's testimony"; there is no requirement that the

child-declarant be determined to be competent to testify before the statement is admitted. *Id.* Because D.C., J.C., and K.C. were found to be competent to testify and did testify at trial, Evid.R. 807 is inapplicable here.

{¶ 71} We note that Remy does not challenge the admissibility of the girls' statements to Dr. Garg, Dr. Vavul-Roediger, Dewberry (the ER social worker), or the girls' therapists at Rocking Horse Center and J.C.'s therapist at Youth Challenges. We agree that these statements fall within Evid.R. 803(4). *See State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944; *Jones* at ¶ 70-82.

### *Audio Recording by Becky*

{¶ 72} Becky was the third witness at trial, following Kayleigh and Logan, who called the police after hearing the recordings Becky made. Becky testified about her relationships with Tamara and the girls. Becky testified, without objection, about a prior allegation by D.C. in 2013 that Remy was "touching her privates and smacking on her." Becky indicated that she informed Tamara of D.C.'s allegation and originally believed that Tamara would take the girls to the doctor, but Tamara did not.

{¶ 73} Becky testified that, in late May 2015, the girls were at Becky's house when J.C. complained to Becky that D.C had hit her (J.C.) in the nose and made her butt bleed. After Becky repeatedly told J.C. that hitting the nose makes the nose bleed, J.C. said, "Oh, well[.] [T]hat must have been when Chris was picking in my butt." (Tr. at 367.) Becky had the three girls come into the front room of her house, and she told them that they were "gonna talk and that it was okay. They couldn't lie." Becky then audio-recorded her conversation with the girls, which was played to the jury without objection.

{¶ 74} During the conversation,[6] the girls can be heard to say that "he did it yesterday after school." D.C. told Becky that, one night, J.C. and K.C. were "touched in their privates" and got "beat to death." D.C. said they were crying and that the crying could be heard from downstairs. J.C. stated that Remy touches her butt. One girl stated that Remy touches her "everywhere," including her "boobs" and "privates," and "won't keep his hands to himself." D.C. stated Remy touches her privates and her butt and smacks her on her butt. J.C. stated that Remy comes into the bathroom when she is in there and touches her with his hand. J.C. stated that Remy "picked at her butt" with his finger and made her poop bloody. Becky asked J.C. if Remy put his finger in her butt, and J.C. responded affirmatively. The girls also indicated that Remy "smacked" all of them and hit them with a belt, a brush, and/or a stick. D.C. said Remy punched her in her mouth and nose and made them bleed. Becky repeatedly asked the girls where their mother was when the events occurred, why Remy did what he did, whether the girls told their mother, what their mother had said, and if they were telling the truth.

{¶ 75} Remy asserts, and the State does not dispute, that D.C., J.C., and K.C.'s statements in Becky's recording were hearsay and were not excluded from or did not fall within a recognized exception to the hearsay rule.

{¶ 76} Upon review of the entire record, we find that counsel's failure to object to the girls' statements to Becky was harmless and could have been the result of a reasonable trial strategy. The girls' allegations of sexual and physical abuse by Remy

---

[6] Because there was no video-recording, the audio-recording is sometimes unclear as to which child made particular statements, particularly when the girls talked at the same time or the statements were made at a softer volume. However, Becky directed some questions to a particular child, and some statements were identifiable by the girls' distinct voices.

were repeated to other individuals during medical examination(s) and/or in counseling sessions with the girls' therapists, and the doctors and therapists testified to those statements at trial. Consequently, the jury would have been aware of the allegations even if Becky's recordings had been excluded.

{¶ 77} And, by allowing the recorded statements to Becky to be admitted early in the trial, the defense was able to develop the argument that Becky lacked the requisite training to appropriately interview the children about the abuse, and that her questions and responses to the children affected the children's subsequent disclosures. Remy's counsel's opening statement emphasized that the case rested on the credibility of the children's allegations. Counsel stated:

> * * * And when you think about this whole case, after you've listened to everything, it all boils down to the statements of three children and whether or not the people that listen to them believe them; and I submit to you that even though those other people that are gonna come and testify might believe the children or have opinions about what the children do, you're allowed, as jurors, to make your own separate judgment and opinion on whether or not those children are credible because that's what the whole story boils down to, three children coming forward.

(Tr. at 53.) Counsel emphasized that the jury should look at "the consistency of somebody's story, the consistency of that story with somebody else, whether or not that story is consistent with physical evidence or, in this case, no physical evidence." (*Id.*) Counsel also emphasized that the jury should consider the timing of the disclosures and the source of the allegations; counsel noted that family members had called the girls

"habitual liars." (Tr. at 54).

{¶ 78} Finally, Remy's counsel's argument reflected a strategy to link disclosures by the girls to the influence of family members. Remy's counsel argued in opening statements that this case showed "a betrayal of grandparents against parents and children against parents and stepparents." (Tr. at 55.)

{¶ 79} Defense counsel's approach to the evidence was reiterated in closing argument. As in his opening statement, counsel argued that the girls' credibility "is what's most important." (Tr. at 1937.) Counsel argued that Dr. Duffee stressed the importance of careful interviewing, and that Becky's recording displayed poor interviewing technique. (Tr. at 1938.) Counsel further argued that there was no physical evidence of sexual or physical abuse; he noted that, unlike Remy, the girls did not have a sexually transmitted disease and that Tamara's family members, who saw the girls on a daily basis, saw no signs of abuse. Counsel emphasized that much of the information about the abuse came from the girls and the grandparents, that the girls' statements were inconsistent, and that the variations in the stories could be timed with decisions by the Department of Job and Family Services regarding the girls. Counsel argued that "there was a plan" by the girls' father's family (Logan, Kayleigh, and others) to get the girls away from Tamara Remy and with their (the father's) family.

{¶ 80} In short, we find that the information contained in Becky's audio-recordings was duplicative of other admissible statements and that counsel's failure to object to the admission of these recordings could reasonably have been part of counsel's trial strategy to undermine the credibility of the girls' subsequent statements.

### Video-Recordings of Forensic Interviews by Lowe at CAC

{¶ 81} After the State presented the testimony of Officer Jenkins, who responded to Logan's 911 call, and of Sergeant Pergram, the State called Shelby Lowe, who had also responded to the Remys' residence and then conducted the forensic interviews of the children on May 29, 2015. Lowe conducted additional forensic interviews of the children on June 2, 2015 (no available recording), August 28, 2015 (all children), October 28 (J.C.), and November 4, 2015 (D.C. and K.C.). All of the available video-recordings were played for the jury.

{¶ 82} At the outset, we reject the State's assertion that Lowe's forensic interviews with D.C., J.C., and K.C. were admissible as statements made for the purpose of medical diagnosis and treatment, pursuant to Evid.R. 803(4). In determining whether statements made to a forensic interviewer at a child advocacy center are made for the purpose of medical diagnosis and treatment, as opposed to forensic investigative purposes, the court must "identify the primary purpose of the statements." *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 28.

{¶ 83} As recognized by the Ohio Supreme Court, " '[t]he purpose of a Children's Advocacy Center is to provide a comprehensive, culturally competent, multidisciplinary response to allegations of child abuse in a dedicated, child friendly setting.' " *Arnold* at ¶ 29, quoting Nancy Chandler, *Children's Advocacy Centers: Making a Difference One Child at a Time*, 28 Hamline J.Pub.L. & Policy 315 (2006), quoting National Children's Alliance, *Accreditation Guidelines for Children's Advocacy Centers* 5 (2004).

{¶ 84} Lowe testified that CAC "is a place where we do forensic interviews" in a "safe, supportive, family-friendly" environment. (Tr. at 451.) CAC falls under the umbrella of the Clark County Department of Job and Family Services, and Lowe

described it as a multi-disciplinary team of forensic interviewers, law enforcement, mental health services, Dayton Children's, the prosecutor's office, victim witness services, the juvenile court, and the department of developmental disabilities. She stated that CAC's purpose was "to reduce trauma to any child that alleges child abuse and/or neglect. We see different, more severe cases out of the Child Advocacy Center." (Tr. at 452.)

{¶ 85} Lowe stated that, when cases were assigned to CAC, "we will coordinate with law enforcement and then set up a forensic interview." (Tr. at 453.) The interview is videotaped so that other team members or law enforcement could review or observe the interview so the child did not have to be interviewed multiple times. Lowe stated that a forensic interview is a fact-finding, nonleading, and non-suggestive interview, where the "primary goal is to interview a small child and find out what happened * * * with their words." (Tr. at 454.)

{¶ 86} If law enforcement is involved, Lowe will coordinate with the detective to schedule the forensic interview. (Tr. at 459.) If, as in this case, the child is under the age of 13, Lowe interviews the child alone, and the detective sits in an observation room to watch and listen to the interview. (Tr. at 460.) Lowe testified that, during the interview, "typically once we get to a certain point * * *, I will step out of the room, the child will stay in the room, and I will go talk to the detective in the observation room to see if they have any questions or comments for that child." (Tr. at 461.) If the child is older than 13, the detective will sit in on the interview with the child. (Tr. at 460.)

{¶ 87} Lowe further testified that part of the forensic interview is "to assess if that child needs a medical or mental health referral." (Tr. at 467.) Lowe stated that, depending on the disclosure, the child may be referred to Dayton Children's. In addition,

to assist children with the traumatic event they've experienced, CAC will refer children to counseling and other agencies, as appropriate. (Tr. at 468.) Lowe stated that the "primary goal" was to assess the child's safety. (Tr. at 469.)

{¶ 88} As per CAC's general practice, Lowe interviewed D.C., J.C., and K.C. separately, with Detective Fent watching in the observation room; Detective Fent had driven D.C. to CAC. At some point during each interview, Lowe left the interview room to consult with Detective Fent. Lowe asked additional questions upon returning to the room. During K.C.'s forensic interview on May 29, 2015, K.C. disclosed that Remy had put his penis in her mouth earlier that day. Because the abuse had occurred within 72 hours of the disclosure, Lowe referred K.C. to Dayton Children's for an examination. (Tr. at 570.) All three girls were referred for counseling. (*Id.*) Lowe and Detective Fent also discussed a safety plan for the girls, and the girls were placed, with Tamara's consent, with the grandparents.

{¶ 89} Detective Fent and Lowe decided that Lowe should reinterview the children on June 2 (the Monday following Friday, May 29), which occurred. Fent was not present for these interviews, which were very short; the recordings of these interviews were lost and not played for the jury. After Lowe received the family-in-need-of-service referral on August 25, 2015, she contacted law enforcement and the grandparents and scheduled additional interviews with the children. The interviews of the girls followed a similar format as the May interviews. (Tr. at 597.) Detective Fent and the family's ongoing case worker, Kelly Pelyhes, observed the interviews from another room, and Lowe stepped out to consult with them during each interview. The same was true of Lowe's interview with D.C. on October 28, 2015 and with D.C. and K.C. on November 4, 2015.

{¶ 90} Based on the evidence before us, the primary purpose of Lowe's forensic interviews with D.C., J.C., and K.C. was for forensic information-gathering, not for the purpose of medical diagnosis and treatment. The interviews were coordinated with law enforcement personnel, Detective Fent observed the interviews from an observation room, and Lowe consulted with Detective Fent prior to completing the interviews that the detective attended. The interviews were not conducted in a medical facility or through referrals from a medical facility, and there is no indication that the children gave the statements for purposes of obtaining a medical diagnosis or treatment. Although referrals to physicians and counselors were made following certain interviews, the primary goals stated by Lowe were information-gathering for child safety, not to provide immediate medical (physical or mental health) care and diagnosis.

{¶ 91} Although the recorded videos of Lowe's interviews were objectionable, we nevertheless conclude, upon review of the entire record, that their admission was harmless. As with the statements in Becky's recordings, the allegations by the children in the challenged interviews with Lowe were repeated to other medical professionals and/or therapists. Accordingly, the content of the children's statements would have been before the jury even absent the video-taped interviews. In addition, even without the video-recordings, Lowe would have been permitted to testify about the demeanor of the children during the interviews and to the referrals that were made as a result of the girls' statements during the interviews. Arguably, Lowe might have been permitted to testify about some of the girls' allegations to explain why the referrals were made, but not for the truth of the allegations themselves.

{¶ 92} Moreover, although the videotaped forensic interviews were more extensive

than the audio recordings by Becky, we similarly conclude that counsel's failure to object to the recorded statements could have been part of a reasonable trial strategy. As noted above, counsel emphasized that the case hinged on the girls' credibility. During closing argument, counsel asked the jury to "look at the consistency of their statements." (Tr. at 1941.) Counsel argued:

> * * * That's one of the tests of credibility. You have the recording from May 25. You have an interview from * * * May 29; and from that entire weekend the only people around are [the grandparents]. Each time they're interviewed, they have a different demeanor.
>
> So on June 2 there's an interview. June 29, a letter comes out saying the charges were unsubstantiated. So what happens? August 28 a call is made, let's get some more stuff in there. October 28, no charges. Another call is made. Let's get something in there. * * *
>
> Even when you listen to [Becky's] recording, you get a different demeanor from the girls from when they were interviewed on May 29. You get a different demeanor from the other interviews and you get a different demeanor from them on the stand; and that's – you have to pick which of these girls you're going to believe. Each of these three girls have presented something different, different facts, different circumstances, who's there, who's not there, things that they saw, whether or not they saw somebody's privates, whether or not their privates were in their mouth, whether or not somebody's mouth was on their privates. Those are all facts. Those are all facts of the case throughout the whole course of their

testimony, throughout their therapy, throughout their interviews, everything. (Tr. at 1941-1943.) Accordingly, counsel could have reasonably elected to have all of the girls' statements before the jury in order to argue that the inconsistencies in the girls' demeanor and the content of the various statements made the girls not credible.

{¶ 93} At oral argument, Remy's appellate counsel argued that defense counsel could have used the recorded statements for impeachment and thus achieved his desired strategy without allowing the recorded statements to be admitted as substantive evidence. We agree that, in most circumstances, this is the better approach, and that the failure to employ this approach could, in some circumstances, constitute ineffective assistance.

{¶ 94} However, in this case, the witnesses to be impeached were three young children under the age of ten. Defense counsel had previously observed and questioned each child, having been present during the in-chambers competency hearing. Counsel was aware that the children had been found to be competent and would be testifying at trial. Counsel may have reasonably believed that the children would be difficult to cross-examine about their prior statements to Lowe at trial, particularly when the children gave different information at different forensic interviews and made different disclosures of abuse over the course of approximately 17 months of therapy.

{¶ 95} In other words, defense counsel may have believed that he could more effectively present his theory of the case by allowing the jury to hear the children's prior statements and then arguing the children were not credible by noting the apparent falsehoods in certain statements by the children and the inconsistencies in the various statements, both the differing statements by the same child or inconsistencies between

the children's statements. For example, during D.C.'s November 4, 2015 forensic interview with Lowe, D.C. was permitted to use the restroom. When D.C. returned, D.C. reported to Lowe that there was "poop" smeared on the toilet and that she (D.C.) did not know who did it. Lowe testified that feces were not smeared on a toilet prior to D.C.'s using the restroom. During his cross-examination of Lowe, Remy's counsel asked, "So are you basically saying that you believe [D.C.] spread the feces on the toilet?" Lowe responded, "Yes." Counsel may have reasonably believed that allowing the jury to view D.C.'s November 2015 forensic interview, counsel was better able to argue that all of D.C.'s statements were not credible.

{¶ 96} The wisdom of defense counsel's strategy may be debatable. However, under the specific facts of this case, we cannot conclude that defense counsel's failure to object to the playing of the videotaped forensic interviews of D.C., J.C., and K.C. was an unreasonable trial strategy. Moreover, upon review of the entire record and given that the children's disclosures would have been before the jury through other witnesses, we cannot conclude that there was a reasonable probability that, but for the alleged errors, the outcome of the case would have been different. *See Strickland* at 688; *Bradley* at 142.

### Statements by K.C. to Pergram and the Grandfather

{¶ 97} Sergeant Pergram and the grandfather both testified about statements made to them by K.C. on May 29, 2015, at CAC.

{¶ 98} Sergeant Pergram testified that he went to CAC, where the girls were taken for forensic interviews. He stated that he "really just stayed in case the officers need anything." (Tr. at 434.) Pergram stated that, while he was talking to some of the staff

at the front desk, K.C. approached him and said, "Chris put his pee hole in my mouth." (Tr. at 435.) Pergram indicated that he was "shocked" and "caught very off guard" by K.C.'s statement; he relayed K.C.'s statement to Detective Fent, who was observing the forensic interviews. (*Id.*)

**{¶ 99}** The grandfather testified that he and his wife went to CAC after being notified that they might need to take care of D.C., J.C., and K.C. The grandparents went to CAC and waited in the waiting area until the children's interviews were completed and they were asked if they could take the children. K.C. made a statement regarding the abuse to the grandfather as they were leaving CAC. The grandfather testified: "Going out to the car, I was holding [K.C.'s] hand and walked her across the street; and she looked up at me and said that Chris had stuck his weiner in her mouth and that she told on him and she was proud of herself." (Tr. at 961.) The grandfather testified that "it was pretty shocking * * * I just looked at her and says, well, that was good." (Tr. at 962.)

**{¶ 100}** Accepting, for sake of argument, that K.C.'s statements to Pergram and the grandfather did not fall within any hearsay exception, we find that their admission was not prejudicial. The jury was aware, through other admissible statements, that K.C. consistently and repeatedly stated that Remy had put his penis in K.C.'s mouth. After K.C.'s forensic interview at CAC on May 29, 2015, the grandparents took K.C. to Dayton Children's. Dr. Garg, who conducted the medical examination, testified that K.C. reported that Remy "put his weiner in her mouth" while her mother was at work. (Tr. at 537.)

**{¶ 101}** K.C. made similar statements throughout her therapy sessions with Sherri Grimone at Rocking Horse Center. For example, on June 30, 2015, K.C. told Grimone

that she [Grimone] needed to call 911 on Remy and that Remy would make her [K.C.] put his weiner in her mouth while her mother was at work; K.C. reported that she had thrown up in the toilet. Grimone further reported that, at that session, K.C. wanted to slice off Grimone's head and Chris's head after the disclosure and wanted Grimone to pretend to call 911 for Remy to go to jail. On October 7, 2015, K.C. stated that Tamara would open her [K.C.'s] mouth and Remy would put his "private parts" in her [K.C.'s] mouth. On December 9, 2015, K.C. told Grimone that Tamara would open her [K.C.'s] mouth so Remy could put his penis in her mouth; K.C. further indicated to Grimone that she was afraid and felt that she would throw up. (At other sessions, K.C. would disclose that Remy had touched and "hurt" K.C.'s private parts.)

{¶ 102} Dr. Vavul-Roediger examined K.C. on October 15, 2015. Dr. Vavul-Roediger testified about her conversation with K.C.:

> * * * When I spoke with the child, I asked her how she was feeling today at the beginning of the checkup and she said good. She talked about with whom she lived and identified Mammaw and Pappaw and pointed to Mammaw and said that Mammaw helps her to wash her hair and [K.C.] then stated she could wash her own private parts.
>
> I asked her who she had previously lived with and she identified her mom, and then I asked her if she could explain why she lives with Mammaw now. She looked down, again, was reserved, and she stated they was hurting us.
>
> And I asked the child who was hurting her, and [K.C.] said, Chris and my mom. And I asked her what happened, and the child said, Chris did

bad stuff to us.   [K.C.] said he put his private in my mouth. * * *

{¶ 103} Finally, K.C., then six years old, testified about the fellatio at trial.   K.C. testified:

Q:   So, [K.C.], when you lived with Tamara and Chris, tell us how that was.

A:   I had a bad life with them.

Q:   Why do you say you had a bad life with them?

A:   'Cause they was doing nasty stuff to me.

Q:   You said they were doing nasty stuff to you.   Who's they?

A:   Chris and Tamara.

Q:   What kind of nasty stuff were they doing?

A:   She was – she was putting her finger in my mouth and Chris had his private area, and he put it in my mouth.

* * *

Q:   So you, Tamara, and Chris were in Tamara and Chris's bedroom. What happened when you were in Tamara and Chris's bedroom that one time?

A:   They did the stuff, and then they got the other two and did it to them.

* * *

Q:   What stuff did they do that time?

A:   They, he put his private area in my mouth and she put her hand in my mouth.

Q:   When you say – she put her hand in your mouth?

A:   No, her finger.

(Tr. 1363-1365.)

{¶ 104} When the prosecutor showed K.C. anatomical drawings that Lowe had shown to K.C., K.C. testified that she had circled the boy's private area and mouth, because "[h]e put it in my mouth." (Tr. at 1372.) K.C. further testified that Tamara was not in the room when Remy put his penis in her mouth (Tr. at 1378) and that Remy "put his area in my mouth" the day before she left their residence (Tr. at 1379). K.C. also testified that when Remy put his penis in her mouth, "I started to throw up, but I didn't yet. But I went in the bathroom and threw up." (Tr. at 1384.)

{¶ 105} Upon review of the entire record, the admission of K.C.'s statements to Sergeant Pergram and the grandfather on May 29, 2015 were harmless beyond a reasonable doubt. Remy's trial counsel's failure to object to those statements did not constitute ineffective assistance.

### Testimony of Dr. Duffee

{¶ 106} Finally, Remy claims that his attorney rendered ineffective assistance by failing to object to improper opinion testimony by Dr. Duffee, the State's child abuse expert. Remy argues that, although Dr. Duffee did not directly vouch for the credibility of the children, he was asked to comment on specific conduct by the children. Remy cites, for example, the following questions by the prosecutor:

Q: Now, we also heard some testimony that one of the siblings may have
been sexually acting out on other siblings. You had touched on that before.
Can you explain why one sibling may sexually act out on other siblings?
(Tr. at 1724.)

* * *

Q: Now, we heard some information about how these children did when they had started therapy; and one of the therapists had described the youngest child, 6-year-old [K.C.], in a session where she had used a bop bag. She identified it as Chris and she stomped on the bop bag. She took a knife, she put it to the therapist's throat [and expressed wanting to cut off the therapist's and Chris's head.] * * * Can you give us some insight as to what's going on when a child shows that sort of – demonstrates that type of violent behavior in a therapy session, a play therapy session. (Tr. at 1727.)

* * *

Q: Now, we've heard one of the therapists describe 9-year-old [D.C.] in her therapy sessions as making disclosures in what seemed to be a different – unique to me. One way she disclosed while she wore a Teenage Mutant Ninja Turtle mask throughout the session. * * * Can you give us some insight into what's going on – [?]   (Tr. at 1729.)

{¶ 107} Evid.R. 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." "An expert witness's testimony that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children is admissible under the Ohio Rules of Evidence." *State v. Stowers*, 81 Ohio St.3d 260, 261, 690 N.E.2d 881 (1998). This is so, because "[a]n expert psychologist's training and professional experience provides the expert with specialized knowledge of the kind recognized under Evid.R. 702 that the average person lacks about behavioral characteristics of minor victims of sexual abuse." *State v. Artz,* 2015-Ohio-

5291, 54 N.E.3d 784, ¶ 57 (2d. Dist.).

{¶ 108} An expert may not offer a direct opinion on whether a child is telling the truth. *E.g.*, *State v. Rosas*, 2d Dist. Montgomery No. 22424, 2009-Ohio-1404, ¶ 42, citing *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989), syllabus. Nevertheless, the Ohio Supreme Court has distinguished between expert testimony that a child is telling the truth and evidence that bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child has been abused. *Stowers* at 262; *see Rosas* at ¶ 42. The prosecution may present "testimony which is additional support for the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity." *Stowers* at 263.

{¶ 109} As quoted above, the prosecutor asked Dr. Duffee several questions related to the specific behavior exhibited by D.C., J.C., and K.C. In answering those questions, Dr. Duffee explained how children who have been sexually abused may manifest those behaviors, but he did not opine on whether D.C., J.C., and K.C. were truthful in their allegations. For example, in response to the question regarding J.C.'s acting out sexually on her sisters, Dr. Duffee explained the behavior as "turning passive into active. When the child is passively a victim, one of the ways that they can deal with the anxiety of being a victim is turning it around and becoming the * * * perpetrator." (Tr. at 1724-1725.) Dr. Duffee continued:

> Now, I would also say in a younger age group, again, with certain families, even multi-generational families, sexual touching may be part of life and may be normalized and may be something that they do. And as a younger child, I mean, until they get into elementary school, they may not know any

different. They may not know that's not something that's socially appropriate.

(Tr. at 1725.)

{¶ 110} Dr. Duffee answered the prosecutor's questions about K.C.'s and D.C.'s therapy sessions by stating how he would interpret, in general, those behaviors in therapy sessions. With K.C.'s violent outburst, Dr. Duffee stated that "in general, that would make me think that the child is actually engaging with the rage that she feels about being a victim; that one of the techniques in therapy is when you have * * * the content, you look for emotion to put with the content * * *; and if you have the emotion, you look for content. 'Cause a lot of times those two things are separated. * * * But it sounds like to me like that would be more of the situation where the child is actually primally in touch with the rage that she feels about the situation." (Tr. at 1728.) Dr. Duffee stated J.C.'s use of a mask illustrated depersonalization, about which he had previously testified. (Tr. at 1729) He stated, "It didn't happen to me; it happened to somebody else. It happened in a dream. It happened to my friend. Those are fascinating ways that a child could protect herself from saying this happened to me and I am the victim, and it shows that she's making progress; but it also, you know, shows that she's got a long way to go."

{¶ 111} None of Dr. Duffee's responses directly asserted that D.C., J.C., and K.C.'s allegations of abuse were truthful. Rather, his testimony generally informed the jury about how children typically disclose sexual abuse, the reasons why disclosure is often delayed and gradual, and how the reactions receiving the allegations can affect future disclosures. Dr. Duffee stated, generally, that malicious and false reporting of sexual abuse is rare and that "the initial disclosure [by younger children] is almost always

correct." (Tr. at 1715.) Dr. Duffee described common patterns of behavior of children who have been sexually abused. Dr. Duffee further described how children commonly deal with the trauma caused by the abuse, such as repeating the abusive behavior, psychic numbing (where children distance themselves from their emotions), derealization (it happened in a dream), depersonalization (it happened to someone else), and dissociation (zoning out). To the extent that Dr. Duffee was asked about specific behavior exhibited by D.C., J.C., and K.C., his testimony indicated how their behaviors fit within the concepts he previously described and why, in general, children may exhibit those behaviors. Dr. Duffee's testimony in this regard was admissible, and thus trial counsel was not ineffective when he failed to object to this testimony.

{¶ 112} Remy further asserts that Dr. Duffee testified that he would find childrens' disclosures to be credible. Remy relies on the following exchange during Dr. Duffee's direct examination:

Q: Now, we had also heard that this same child had made disclosures that she witnessed Mom harm cousins. Based on your training, education, and experience, is that also, to push abuse off onto a completely different person, is that another way of depersonalizing and dissociating?

A: Well, as a pediatrician, *I would be concerned and I would have to report that and kind of take it at face value first*; but beyond that, I would say that, yes, I think that it's very common for kids to say that this happened to my cousin or this happened to my sister because they're unable to say this happened to me, yet. And eventually they'll be able to say this happened to me. And those aren't contradictions. Those are just incremental

disclosures and somehow this happened to somebody else; and eventually they'll be able to say, well, yes, it happened to me and then I can close it off and I can go on with my life.

(Emphasis added; Tr. at 1730.)

{¶ 113} Dr. Duffee's response did not indicate, as Remy asserts, that he found the child's disclosure to be credible. Rather, his full response indicated that, as a doctor with an obligation to report suspected abuse, he had an obligation to take the allegation at face value at first. (Dr. Vavul-Roediger made a similar comment during her testimony.) Dr. Duffee further indicated that it would not be uncommon for a child to depersonalize the abuse and report it as having occurred against another person. We find nothing in Dr. Duffee's answer to mean that he found D.C., J.C., and K.C. to be credible and their allegations to be truthful.

{¶ 114} Although not specifically raised by Remy in his appellate brief, we are troubled by Dr. Duffee's testimony about the general veracity of children's sexual abuse disclosures. Dr. Duffee testified that "[m]alicious and false reports are very uncommon" (Tr. at 1714), and that, in younger children, "the initial disclosure is almost always correct, is almost always true; and it's even punctuated by the fact that if later they deny it, in general, they're denying it for other reasons, not because it wasn't true, the original disclosure wasn't true." (Tr. at 1715.) However, even if that testimony were objectionable, we cannot find on this record a reasonably probability that, but for this error, the outcome of the trial would have been different.

{¶ 115} Remy's third assignment of error is overruled.

### V. Prosecutorial Misconduct

{¶ 116} In his second assignment of error, Remy claims that the prosecutor engaged in misconduct during closing arguments by referring to Remy as a monster.

{¶ 117} The test for prosecutorial misconduct is whether the prosecutor's remarks or questions were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Exon*, 2d Dist. Clark No. 2014-CA-106, 2016-Ohio-600, ¶ 40, citing *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. *State v. Williams*, 2d Dist. Montgomery No. 24548, 2012-Ohio-4179, ¶ 51, citing *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). The focus of the inquiry is on the fairness of the trial, not on the culpability of the prosecutor. *State v. Bey*, 85 Ohio St.3d 487, 496, 709 N.E.2d 484 (1999).

{¶ 118} Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

{¶ 119} In general, prosecutors enjoy a wide degree of latitude during closing arguments. *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12. They may freely address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *State v. Black*, 181 Ohio App.3d 821, 2009-Ohio-1629, 911 N.E.2d 309, ¶ 33 (2d

Dist.).  "However, prosecutors must refrain from making misleading insinuations and assertions as well as expressing personal beliefs or opinions regarding the defendant's guilt.  Prosecutors must also refrain from alluding to matters unsupported by admissible evidence.  'It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury.' "  (Citations omitted.) *State v. Richmond*, 2d Dist. Greene No. 2005 CA 105, 2006-Ohio-4518, ¶ 15, quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

**{¶ 120}** In addition, prosecutors may not make statements that are "so inflammatory as to render the jury's decision a product solely of passion and prejudice against the appellant."  *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). "Where it appears that prosecutorial comments constituted an invitation to the jury to go beyond the evidence or were so flagrant as to incite the passions or prejudice of the jury, and thereby deny the accused a fair trial, prejudicial error may inhere."  *State v. Slagle*, 8th Dist. Cuyahoga No. 55759, 1990 WL 82138, * 9 (June 14, 1990), citing *State v. Price*, 60 Ohio St.2d 136, 140, 398 N.E.2d 772 (1979); *State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366, ¶ 110.

**{¶ 121}** Remy points to the following portion of the prosecutor's rebuttal closing argument:

[My co-counsel] talked to you [during her closing argument] about a parent's duties; and if you think about the things that parents do for their kids and their well-being, you heard that these girls were removed on May the 29th, 2015, taken to [the grandmother's] custody and care and, by all accounts, [the grandmother] had no relationship with these girls.  So this

must have been a big change for them.

And when Tamara was asked to go pack for the girls, gave them a couple, little bit of clothes, no lovies, stuffed animals, and things of that nature; and she never called [the grandmother] that weekend. She never called to check in on her girls in a strange environment when law enforcement's been involved and they've been removed from home. She didn't ask to stop by and see them and see how they were doing with this.

*As parents, even when we don't believe our kids – like, Mom, I think there's a monster under my bed; I can't go to sleep – we, as parents, check under the bed and assure them, oh, I've looked. There's no monster. You're safe. I will do what I need to do to make you feel safe. Even if we don't believe it.*

*What does Tamara do? On July 2, 2015, she paraded the monster in front of them at the visitation center. He was there for when they arrived, their own personal monster.* Their fears, even if she doesn't believe that that's what he did to them, as a mother, you don't try to scare your children. You take away their fears. You remove those things, but he was there for them to see. Just another part of the intimidation.

(Emphasis added; Tr. at 1972-1973.)

**{¶ 122}** Upon review of the entire record, we cannot conclude that the prosecutor's isolated statement resulted in any prejudice to Remy. At the outset, the prosecutor's back-handed reference to Remy as a "monster" was made in the context of rebuttal argument regarding an intimidation count against Tamara Remy, not regarding Remy's

actions themselves. The substance of the argument was that Tamara Remy committed intimidation of a victim/witness by not shielding her children from Remy at a visitation. Remy was analogized to the monster under the bed for these children; the jury was not asked to convict Remy because Remy was a monster who needed to be locked away. We do not approve of the State's reference to a defendant as a "monster" in closing argument, whether explicitly or metaphorically. Nevertheless, in context, the prosecutor's isolated comment was not "so inflammatory as to render the jury's decision a product solely of passion and prejudice against the appellant." *See Williams*, 23 Ohio St.3d at 20.

{¶ 123} Furthermore, the jury heard many days of testimony from the victims, social workers, physicians, family members, police officers, and others regarding the allegations against Remy. The State's closing argument went through each count individually, identifying what evidence supported each charge against him; this closing argument took 31 pages of transcript. The State's rebuttal closing argument, during which the offending statement was made, took 22 pages of transcript. The jury was instructed that closing statements of counsel were not evidence, and were not to be considered in reaching its verdict. During deliberations, the jury asked for transcripts of several witnesses' testimony and sent several questions to the court. We find no suggestion that the prosecutor's isolated remark during rebuttal closing argument had any effect on the jury's deliberations.

{¶ 124} Remy's second assignment of error is overruled.

### VI. Conclusion

{¶ 125} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies mailed to:

Andrew P. Pickering
Joshua Engel
Mary Martin
Hon. Richard J. O'Neill

**APPENDIX**
**State v. Christopher Chase Remy**
**(Clark App. No. 17 CA 6)**

| COUNT | OFFENSE | CHILD | R.C. SECTION | DEG | SENTENCE |
|---|---|---|---|---|---|
| 1 | Rape – fellatio | D | 2907.02(A)(1)(b) | F1 | Life w/o Parole |
| 2 | Rape – vaginal | D | 2907.02(A)(1)(b) | F1 | Life w/o Parole |
| 3 | Rape – anal | D | 2907.02(A)(1)(b) | F1 | Life w/o Parole |
| 4 | Rape – digital (vag) | D | 2907.02(A)(1)(b) | F1 | Life w/o Parole |
| 5 | Rape – digital (anus) | D | 2907.02(A)(1)(b) | F1 | Life w/o Parole |
| 6 | Gross Sexual Imposition – vagina | D | 2907.05(A)(4) | F3 | 48 months |
| 7 | Gross Sexual Imposition – buttocks | D | 2907.05(A)(4) | F3 | 48 months |
| 8 | Gross Sexual Imposition – breast | D | 2907.05(A)(4) | F3 | 48 months |
| 9 | Intimidation | D | 2921.04(B)(1) | F3 | 30 months |
| 10 | Domestic Violence | D | 2919.25(A) | M1 | 180 days jail |
| 11 | Endangering Children | D | 2919.22(B)(2) | F3 | 36 months |
| 15 | Rape – fellatio | J | 2907.02(A)(1)(b) | F1 | Life w/o Parole |
| 16 | Rape – digital (vag) | J | 2907.02(A)(1)(b) | F1 | Life w/o Parole |
| 17 | Rape – digital (anus) | J | 2907.02(A)(1)(b) | F1 | Life w/o Parole |
| 18 | Gross Sexual Imposition – vagina | J | 2907.05(A)(4) | F3 | 48 months |
| 19 | Gross Sexual Imposition – buttocks | J | 2907.05(A)(4) | F3 | 48 months |
| 20 | Gross Sexual Imposition – breast | J | 2907.05(A)(4) | F3 | 48 months |
| 21 | Intimidation | J | 2921.04(B)(1) | F3 | 30 months |
| 22 | Domestic Violence | J | 2919.25(A) | M1 | 180 days jail |
| 31 | Rape – fellatio | K | 2907.02(A)(1)(b) | F1 | Life w/o Parole |
| 32 | Rape – cunnilingus | K | 2907.02(A)(1)(b) | F1 | Life w/o Parole |
| 33 | Attempted Rape | K | 2923.02(A) | F1 | Dismissed |
| 34 | Gross Sexual Imposition – vagina | K | 2907.05(A)(4) | F3 | 48 months |
| 35 | Gross Sexual Imposition – buttocks | K | 2907.05(A)(4) | F3 | 48 months |

| 36 | Gross Sexual Imposition - breast | K | 2907.05(A)(4) | F3 | Acquittal |
|----|----------------------------------|---|---------------|----|-----------|
| 37 | Intimidation | K | 2921.04(B)(1) | F3 | 30 months |
| 38 | Domestic Violence | K | 2919.25(A) | M1 | 180 days jail |

**Consecutive sentences**: Counts 1, 15, 31

**Mandatory prison terms**: Counts 1-5, Counts 15-17, Counts 31-32