[Cite as *State v. Vicario*, 2025-Ohio-5406.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO <br><br> Plaintiff - Appellee <br><br> -vs- <br><br> STEVEN VICARIO <br><br> Defendant – Appellant | Case No. 25-CAA-030021 <br><br> <u>Opinion And Judgment Entry</u> <br><br> Appeal from the Delaware County Court of Common Pleas, Case No. 24-CRI-04-0244 <br><br> Judgment: Affirmed <br><br> Date of Judgment Entry:December 3, 2025 |

**BEFORE:** WILLIAM B. HOFFMAN, P.J.. ROBERT G. MONTGOMERY, J. & KEVIN W. POPHAM, J.; Appellate Judges

**APPEARANCES:** Katheryn L. Munger, By Melissa Schiffel, for Plaintiff-Appellee; Stephen E. Palmer, For Defendant-Appellant

OPINION

*Popham, J.,*

{¶1} Defendant-Appellant Steven M. Vicario ("Vicario") appeals his conviction and sentence after a jury trial in the Delaware County Court of Common Pleas. For the reasons set forth below, we affirm.

*Facts and Procedural History*

{¶2} On April 18, 2024, an indictment was returned charging Vicario with five counts involving the sexual abuse of his stepdaughter V.M. (b. Oct. 13, 2009).[1]

{¶3} A superseding indictment was filed on August 21, 2024, charging Vicario with:

Count 1: Rape, force or threat of force, Nov. 5, 2023, a felony of the first degree in violation of R.C. 2907.02(A)(2)/(B);

Count 2: Sexual Battery, stepparent, Nov. 5, 2023, a felony of the third degree in violation of R.C. 2907.03(A)(5)/(B);

Count 3: Rape, force or threat of force, Nov. 5, 2023, a felony of the first degree in violation of R.C. 2907.02(A)(2)/(B);

Count 4: Sexual Battery, stepparent, Nov. 5, 2023, a felony of the third degree in violation of R.C. 2907.03(A)(5)/(B);

Count 5: Tampering with Evidence, Nov. 5, 2023, a felony of the third degree in violation of R.C. 2921.12(A)(1)/(B);

Count 6: Rape, force or threat of force, Oct. 13, 2022, a felony of the first degree in violation of R.C. 2907.02(A)(2)/(B);

Count 7: Sexual Battery, stepparent, Oct. 13, 2022, a felony of the third degree in violation of R.C. 2907.03(A)(5)/(B); and

Count 8: Gross Sexual Imposition, force or threat of force, [no date specified], a felony of the fourth degree in violation of R.C. 2907.05(A)(1)/(C)(1).

---

[1] Recognizing the heightened privacy interests of minors, we identify the parents and minors only by their initials in accord with Sup.R. 1(A), 44(C), 44(H) and 45(D); S.Ct.Prac.R. 3.12; R.C. 2303.901; Juv.R. 4.

**Pretrial Motions and Rulings**

{¶4}    Before trial, several evidentiary issues were addressed through pretrial motions. On January 27, 2025, the defense filed a notice of intent to introduce potential evidence under R.C. 2907.02(D)/(E) concerning an alleged prior sexual assault against V.M. by a different adult male. Following a hearing, the trial court determined the evidence was inadmissible and granted the State's motion to exclude it. *Judgment Entry, Feb. 5, 2025.*

{¶5}    On February 1, 2025, the State moved in limine to exclude V.M.'s internet search history as irrelevant and improper. *Docket Entry No. 176.* On February 4, 2025, the defense filed a response. *Docket Entry No. 178*. After voir dire of the jury had been completed, the court heard argument on that issue and, after discussion, deferred ruling until V.M.'s testimony. 1T. at 200.[2]

{¶6}    On February 4, 2025, the defense filed a motion in limine to preclude testimony by forensic interviewer Jami Casto regarding an April 4, 2024, interview of the victim, V.M., during which she made additional statements about the November 5, 2023, incident. *Docket Entry No. 179.* The trial court heard argument and deferred ruling until it could conduct a voir dire of Casto prior to her testimony at trial. 1T. at 212.

{¶7}    The matter proceeded to a jury trial commencing on February 4, 2025. The evidence presented at trial established the following sequence of events.

**Testimony of M.V. – Victim's Mother**

---

[2] For clarity, the transcript of Vicario's jury trial will be referred to as "__T.__" signifying the volume and page number.

{¶8}   The victim's mother, M.V. ("Mother"), testified that she met Vicario in the spring of 2022, moved in with him that fall along with her two daughters, and married him in September 2023. 2T. at 251, 258.

{¶9}   Mother testified that on the night of November 5, 2023, she went to bed around 9:00 or 10:00 p.m. and later awoke to find Vicario missing from their bed. 2T. at 259. She then heard him return to the bedroom and open the drawer of his nightstand before leaving again. *Id.* at 260. Unable to fall back asleep, Mother decided to check on V.M. *Id.* at 261.

{¶10}  As she entered the hallway, Mother observed Vicario leaning over V.M.'s bed, positioned with one knee and both hands on the mattress. *Id.* at 262. Mother was able to observe a little of V.M.'s exposed buttocks. *Id.* at 263. Mother did not see V.M.'s underwear down around her ankles when she entered the room. *Id.* at 308. When she uncovered V.M., Mother observed V.M. was naked from the waist down.  *Id.* at 264. Mother testified that when she confronted Vicario he appeared "freaked out." *Id.* at 265. She felt his pajama shorts and noticed that they were damp. *Id.*

{¶11}  Mother testified that, as V.M. got dressed, V.M. discovered a bottle of lubricant on the floor beside her bed. 2T. at 265. Mother directed V.M. to take a photograph of the bottle, which she did. *Id.;* State's Exhibit B. Mother testified that the lubricant was left on V.M.'s bed when she and her daughters subsequently left the home. *Id.* at 265. Mother further explained that the lubricant had typically been stored in Vicario's nightstand, and that she had not seen it for several months prior to the incident, when it was last seen under the couple's bed. *Id.* at 266, 272-274.

{¶12} Mother testified that although she did not see any exposed genitalia or obvious signs of arousal, she saw Vicario's hands on top of the blanket. 2T. at 279. She acknowledged that V.M. had a history of behavioral issues, sometimes woke up without clothing, and may have previously engaged in self-touching. *Id.* at 273-274, 284-285.

{¶13} Acting immediately, she took both daughters to the police station and then to Nationwide Children's Hospital (NCH) in Columbus. 2T. at 267. Mother testified that she brought V.M. back to NCH again in April 2024 for an unrelated sexual assault incident involving a different individual. *Id.* at 269.

**Testimony of V.M. – The Victim**

{¶14} V.M. testified that on the evening of November 5, 2023, she went to bed around 9:30 p.m. wearing pajama shorts and a T-shirt. 2T. at 318, 324. She awoke to find Vicario standing behind her bed. *Id.* at 326. According to V.M., Vicario silently pulled her shorts and underwear down to her calves. *Id.* at 327. Frightened, she pretended to be asleep. *Id.*

{¶15} V.M. testified that Vicario rubbed his penis against her vagina and attempted to insert it. 2T. at 329. He then climbed onto the bed and rubbed his penis against her anus before moving it "in and out," which she described as "wet and painful." *Id.* at 330-333. She testified that he did not penetrate her vaginally. *Id.* at 383.

{¶16} V.M. testified that, as she heard her mother approaching, Vicario pulled away, pulled up his pants, and covered her with a blanket. 2T. at 333-334. When Mother entered and questioned Vicario, V.M. testified that Vicario claimed he was checking on V.M. because he thought he heard her scream. *Id.* at 334, 341.

{¶17} V.M. testified that her mother inspected her thighs, after which V.M. dressed herself. 2T. at 342, 372-373. V.M. testified that she was wet and used her underwear to wipe herself. *Id.* at 342, 375.

{¶18} While dressing, she saw the bottle of lubricant under her bed and, at her mother's direction, photographed it before leaving the home. *Id.* at 344-347; State's Exhibit B.

{¶19} V.M. further testified that Vicario had sexually assaulted her on an earlier occasion. 2T. at 336, 360, 398. During that incident, Vicario entered her room, removed her blanket, pulled down her shorts and underwear, and rubbed his penis on her vagina and anus before penetrating her anally. *Id.* at 336-339. V.M. explained that she did not disclose the abuse at the time because she was "nervous and scared." *Id.* at 340.

{¶20} V.M. testified that during her initial forensic interview after the November 5, 2023 incident, she said she had been asleep and did not know what had happened, as she was too frightened to discuss it. 2T. at 352-353. When interviewed again in April 2024 in connection with an unrelated sexual assault, she disclosed the full details of both incidents. *Id.* at 353-354.

{¶21} On cross-examination, V.M. admitted that she had previously viewed pornography and engaged in masturbation. 2T. at 376-378.

**Forensic Interviews**

{¶22} The State presented testimony from two forensic interviewers who separately spoke with V.M.

**November 5, 2023, Interview – Sierra Sammons**

{¶23}  Sierra Sammons, a licensed social worker and forensic interviewer at NCH, conducted the initial interview on the night of the incident. 3T. at 447-448; State's Exhibit C-1. V.M. told Sammons that she did not know exactly what had happened because she had been asleep, but she noted that she went to bed wearing underwear and woke to find it around her ankles. *Id.* at 449-450. She also reported rectal pain "like after a bad poop," a wet sensation, and the presence of lubricant under the bed. *Id.*

**April 4, 2024 Interview – Jami Casto**

{¶24}  The second interview occurred five months later, on April 4, 2024, conducted by forensic interviewer Jami Casto. 4T. at 703.

{¶25}  Prior to her testimony, the trial court conducted a voir dire of Casto and ruled that her testimony was admissible. 4T. at 679, 698-699.

{¶26}  Although the primary purpose of the interview concerned a sexual assault involving another individual, the court - over defense objection - allowed Casto to testify that V.M. reported during the April 4, 2024, interview that on November 5, 2023, Vicario "penetrated her with his penis anally and vaginally." *Id.* at 706-707.  On cross-examination, Casto acknowledged that V.M. did not explicitly state that vaginal penetration occurred, but that he "tried to penetrate" her. *Id.* at 709-711.

**PSANE Examination**

{¶27}  The State further introduced testimony from Cecelia Tirey, a Pediatric Sexual Assault Nurse Examiner ("PSANE"), who examined V.M. following the incident on November 5, 2023. Tirey testified that she conducted an anogenital examination and

discovered a globular substance inside the labia minora[3] and on the hymen. 3T. at 491. Although V.M. reported rectal pain, there were no visible injuries such as bruising, tearing, or redness. Tirey explained this was consistent with sexual assault involving penetration. *Id.* at 476, 488.

{¶28} As part of the rape kit, Tirey collected vaginal, anal, and external genital swabs and submitted the swabs to the Bureau of Criminal Investigation (BCI) for testing. 3T. at 480, 483; State's Exhibits E-1 through E-3.

**Medical Evidence**

{¶29} Dr. Anne Runkle, an attending physician at NCH, participated in V.M.'s medical care on April 4, 2024. 4T. at 714, 718. She testified that a normal physical examination does not exclude sexual assault, as it is common for such cases to present without visible injuries, even with reported penetration. *Id.* at 723.

**The State's DNA Evidence**

{¶30} The State presented extensive forensic testimony through multiple witnesses from the Bureau of Criminal Investigation (BCI). Forensic scientists Justin Masin and Allison Mansius analyzed the biological samples collected from V.M.'s sexual-assault kit, including vaginal, anal, and external genital swabs, as well as known DNA standards from both V.M. and Vicario. 3T. at 515, 562, 519-520.

{¶31} Initial screening revealed no detectable semen on any of the collected swabs. 3T. at 521. Testing of Vicario's underwear identified two DNA contributors: Vicario as the major profile and an additional, insufficient minor profile that could not be developed further. *Id.* at 562-564, 578-580. The vaginal swabs contained predominantly

---

[3] The labia minora are the two inner folds of skin that surround the vaginal opening.

female DNA with a minimal trace of male DNA, likewise too limited to produce a definitive profile. *Id.* at 583-586.

{¶32} By contrast, DNA profiles obtained from the anal swab were consistent with contributions from both V.M. and Vicario. 3T. at 586-588.

{¶33} Masin explained that acid phosphatase, an enzyme commonly found in seminal fluid, is used as an indicator of possible sexual activity. 3T. at 536. He described the test procedure as follows: when the enzyme reacts with a chemical substrate, the color changes from clear to purple within ten minutes, indicating a positive result. *Id.* at 538. A negative result, by contrast, produces no color change.

{¶34} Masin confirmed that his colleague, Mansius, performed the acid phosphatase testing and reported positive results for multiple swabs, including those from the vaginal and anal areas, both thighs, the buttocks, and V.M.'s lower back, as well as Vicario's underwear. *Id.* at 537-538; State's Exhibit G-1.

{¶35} On cross-examination, Masin acknowledged that all positive results were weak reactions and that the enzyme can also appear in vaginal secretions, feces, or saliva. 3T. at 544-548; Defendant's Exhibit 2.

{¶36} Mansius testified that the labia majora swab contained a mixture of DNA from two individuals consistent with both V.M. and Vicario. She reported that the probability of an unrelated individual matching the minor DNA profile was approximately 1 in 600 million, meaning that 600 million random individuals would need to be tested to find one consistent with that profile. 3T. at 586-587.

{¶37} Mansius also testified that the anal swab contained male DNA, though not in sufficient quantity for standard comparison, prompting submission for Y-STR testing, which isolates the male Y chromosome. 3T. at 590-591.

{¶38} BCI forensic scientist Erika Jimenez provided quantitative analysis of those samples. She explained that the Y chromosome is inherited along the paternal line, meaning males in the same family, such as fathers, sons, or uncles, share identical Y-STR profiles. 3T. at 622. Jimenez determined that the vaginal sample contained 0.4 nanograms and the anal sample 0.5 nanograms of male DNA - 20 and 25 times the minimum quantity required for valid Y-STR analysis. 3T. at 623-634; State's Exhibit G-3.

{¶39} Jimenez testified that her results demonstrated that the Y-STR profiles from both the vaginal and anal swabs were consistent with Vicario's male paternal lineage. 3T. at 624. However, on cross-examination Jimenez acknowledged that DNA transfer can occur indirectly, including through secondary contact, and does not necessarily prove sexual activity. *Id.* at 632-636.

**Testimony of Detective Brett Simon**

{¶40} Detective Brett Simon of the Delaware Police Department testified regarding his investigation and evidence collection. On November 5, 2023, Simon executed a search warrant at Vicario's residence, seizing critical items including the bed sheets from V.M.'s room and an old cell phone used secretly by the victim. 4T. at 741, 743.

{¶41} Simon photographed a white, crusty residue on V.M.'s bed sheet using low-angle lighting to make the stain visible, noting its location slightly left of center on the bed where V.M. reportedly slept. 4T. at 786-788; State's Exhibit A-45. The photographs were

taken approximately twelve hours after the incident. Simon acknowledged that the victim's mother had mentioned V.M.'s prior incidents of self-touching. 4T. at 790-791.

{¶42} Simon noted that V.M.'s underwear - reportedly used to wipe herself after the incident - was never recovered. 4T. at 797-798. He also confirmed that Vicario's boxer shorts showed no visible residue when collected. 4T. at 788-789.

{¶43} Significantly, Simon testified about the bottle of lubricant described by the victim and her mother. Although Mother reported telling V.M. to photograph the bottle and leave it on the bed after the incident, it was missing when Simon entered the room pursuant to the search warrant. 4T. at 746-747. Simon testified that when first questioned Vicario denied moving or disposing of anything in the house, stating that he had last seen the lubricant months earlier under the marital bed. 4T. at 747-748.

{¶44} After advising Vicario he was free to leave, Simon and other officers continued searching. They subsequently discovered the bottle of lubricant in a trashcan inside the master bathroom vanity, located in the bedroom Vicario shared with his wife. 4T. at 776-778; State's Exhibits A-110-A-112; State's Exhibit I. Simon testified that, when confronted, Vicario initially denied moving the item but later admitted he had thrown it away after finding it on V.M.'s bed. 4T. at 780.

{¶45} Simon testified that the bed sheets and underwear were not tested by BCI, and that he had worn a single pair of gloves throughout evidence collection - a practice he conceded could facilitate cross-contamination or secondary DNA transfer. 4T. at 796-800.

**Defense Evidence**

**Expert Testimony – Dr. Julie Heinig[4]**

{¶46}  The defense called Dr. Julie Heinig, a forensic DNA expert, who reviewed BCI's reports. She testified regarding different types of DNA transfer - primary, secondary, and wear transfer - and explained that DNA can accumulate on objects through repeated contact or friction. 3T. at 647-649.

{¶47}  While Dr. Heinig agreed with BCI's analytical results, she emphasized that no expert, including herself, could determine the source, timing, or mechanism by which the DNA was deposited. 3T. at 651, 660.

**Expert Testimony – Dr. Robert Stinson**

{¶48}  The defense also presented Dr. Robert Stinson, a board-certified forensic psychologist, who testified regarding memory, suggestibility, and false allegations in child witnesses. 4T. at 853-864. Dr. Stinson explained that false reports can result either from deliberate fabrication or from genuine, but inaccurate, memories shaped by external suggestion. Although suggestibility affects individuals of all ages, he noted that it is especially pronounced in children or persons with lower intellectual functioning. Portions of his testimony were excluded because his written report did not identify the underlying data sources. 4T. at 851-854, 871-872.

**Testimony of the Defendant**

{¶49}  Vicario testified in his own defense. He unequivocally denied any sexual contact with V.M. on the morning in question or at any prior time. 4T. at 881-885. He testified that he entered V.M.'s room only after hearing noises and leaned over to check

---

[4] Dr. Heinig was called by the defense out of order during the State's presentation of its case due to her inability to be available during the presentation of Vicario's case in chief.

on her without touching her. According to Vicario, a comforter fully covered her, and her body was not exposed. He claimed that M.V. entered the room suddenly, shouted accusations, and startled him, causing him to fall backward. *Id.* at 885-888.

{¶50} Vicario further admitted discarding the bottle of lubricant in his bathroom trashcan but insisted he did so innocently, explaining that he and his wife had used it weeks earlier and that it had been stored under their bed - not in V.M.'s room. 4T. at 890-891. He maintained that, if he had intended to conceal it, he could have easily disposed of it elsewhere. *Id.* at 891-892. Throughout his testimony, Vicario vehemently maintained his innocence and denied all allegations of sexual misconduct. 4T. at 893-894.

**Verdict and Sentence**

{¶51} Following deliberations, the jury returned guilty verdicts on Count One (Rape), Count Two (Sexual Battery), Count Three (Rape), Count Four (Sexual Battery), and Count Five (Tampering with Evidence). Vicario was acquitted on Count Six (Rape) and Count Seven (Sexual Battery). Count Eight (Gross Sexual Imposition) was dismissed by the State prior to submitting the case to the jury. 4T. at 820.

{¶52} At sentencing on February 12, 2025, the trial court imposed an indefinite, mandatory prison term with a minimum length of 11 years each on Counts One and Three (Rape) and a 36-month definite sentence on Count Five (Tampering with Evidence), ordering all sentences to run consecutively for an aggregate indefinite prison term with a

minimum length of 25 years and a maximum length of 31.5 years[5]. The court also classified Vicario as a Tier III Sex Offender.

*Assignments of Error*

{¶53} Vicario raises seven assignments of error for our consideration,

{¶54} "I. THE TRIAL COURT ERRED BY EXCLUDING EVIDENCE OF THE ALLEGED VICTIM'S PORNOGRAPHY SEARCH HISTORY, WHICH CLOSELY RESEMBLED THE ALLEGATIONS IN THIS CASE, THEREBY VIOLATING THE RULES OF EVIDENCE AND DEPRIVING APPELLANT OF DUE PROCESS, HIS RIGHT OF CONFRONTATION, AND HIS RIGHT TO PRESENT A COMPLETE DEFENSE UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION."

{¶55} "II. THE TRIAL COURT COMMITTED ERROR BY PERMITTING TESTIMONY FROM A STATE EXPERT IN VIOLATION OF OHIO CRIMINAL RULE 16(K), THEREBY DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION."

{¶56} "III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY EXCLUDING TESTIMONY FROM THE DEFENSE EXPERT BASED ON OMITTED CITATIONS IN HIS REPORT, THEREBY VIOLATING APPELLANT'S RIGHT TO PRESENT A COMPLETE DEFENSE AND TO DUE PROCESS UNDER THE FIFTH,

---

[5] The trial court found that Count One and Count Two merge and Count Three and Count Four merge.

SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SIMILAR PROVISIONS OF THE OHIO CONSTITUTION."

{¶57} "IV. THE TRIAL COURT ERRED BY PERMITTING TESTIMONY FROM FORENSIC INTERVIEWER JAMIE CASTO RECOUNTING HEARSAY STATEMENTS MADE BY THE ALLEGED VICTIM DURING A FOLLOW-UP FORENSIC INTERVIEW, IN VIOLATION OF THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SIMILAR PROVISIONS OF THE OHIO CONSTITUTION."

{¶58} "V. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE STATE TO IMPEACH ITS OWN WITNESS WITH A PRIOR INCONSISTENT STATEMENT CONCERNING A COLLATERAL MATTER WITHOUT ESTABLISHING AFFIRMATIVE DAMAGE, IN VIOLATION OF EVID.R. 607, THEREBY DEPRIVING APPELLANT OF DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION."

{¶59} "VI. THE TRIAL COURT ERRED AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION BY OVERRULING APPELLANT'S CRIM. R. 29 MOTION FOR JUDGMENT OF ACQUITTAL, AS THE STATE FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE EACH AND EVERY ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT."

**{¶60}** "VII. THE TRIAL COURT ERRED BY FINDING APPELLANT GUILTY AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY PROVISIONS OF THE OHIO CONSTITUTION BECAUSE THE VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

I.

**{¶61}** In his first assignment of error, Vicario contends that the trial court erred in excluding evidence that the alleged victim, V.M., searched for pornography resembling the sexual acts she later accused him of committing. He asserts that the exclusion of this evidence violated his constitutional right to confrontation and deprived him of the opportunity to present a complete defense. We disagree.

**Standard of Review – Admissibility of Evidence**

**{¶62}** A trial court enjoys broad discretion in determining the admissibility of evidence, provided its rulings comply with procedural and evidentiary rules. *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991). Even when a trial court abuses its discretion, reversal is warranted only if the error affects a substantial right or results in a miscarriage of justice. *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165 (1980); *Beard v. Meridia Huron Hosp.*, 2005-Ohio-4787, ¶ 20. However, evidentiary rulings that implicate a defendant's constitutional rights, such as the right to confrontation, are reviewed de novo. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010); *State v. McKelton*, 2016-Ohio-5735, ¶ 97; *State v. Anthony*, 2021-Ohio-1916, ¶ 25 (5th Dist.).

**Background**

**{¶63}** On February 1, 2025, the State filed a motion in limine to exclude evidence of V.M.'s web search history, arguing the material was irrelevant and inadmissible. *Docket*

*Entry No. 176*. On February 4, 2025, the defense filed a memorandum contra. February 4, 2025. *Docket Entry No. 178*. Following jury voir dire, the trial court heard the arguments of counsel, and, after discussion, deferred ruling until V.M.'s testimony. When the issue arose at trial, the court held that V.M.'s search history "isn't relevant to defense's position about DNA and how Mr. Vicario's DNA allegedly made its way onto the victim." 2T. at 219.

{¶64} Vicario maintains that this ruling improperly prevented him from showing that V.M. fabricated her allegations after viewing pornography that depicted similar acts.

**Right to Present a Complete Defense**

{¶65} The right to present a defense is fundamental to a fair trial. As the United States Supreme Court has long recognized, "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). This guarantee, whether rooted in due process, or in the Compulsory Process and Confrontation Clauses, ensures that a defendant has "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Washington v. Texas*, 388 U.S. 14, 23 (1967); *State v. Swann*, 2008-Ohio-4837, ¶ 12.

{¶66} That said, this right is not absolute. States retain broad latitude to adopt evidentiary rules designed to exclude unreliable or prejudicial material. *United States v. Scheffer*, 523 U.S. 303, 308-309 (1998). Such restrictions are permissible so long as they are not arbitrary, disproportionate, or unduly burdensome on the defendant's ability to present a defense. *Rock v. Arkansas*, 483 U.S. 44, 56-58 (1987); *State v. Wesson*, 2013-Ohio-4575, ¶ 59.

**Application to the Present Case**

{¶67}  Here, the trial court determined that V.M.'s specific pornographic search terms and website visits were irrelevant to the core issue - how Vicario's DNA was allegedly transferred to the victim. Under Evid.R. 401, evidence is relevant only if it makes a consequential fact more or less probable than it would be without the evidence. The court reasonably determined that V.M.'s prior internet searches were not relevant to the DNA evidence, which formed the basis of the defense's proffered theory of relevance.

{¶68}  Nevertheless, Vicario argues that the search history was critical to his defense theory that V.M. fabricated the allegations. Vicario argues that the evidence of search terms and results that resemble the allegations made by V.M. against Vicario would support the defense claim that V.M. invented the story. (Appellant's brief at 10).

{¶69}  Yet, the record demonstrates that Vicario was not prevented from advancing this theory. The trial court permitted wide-ranging cross-examination of V.M., including questions about whether she watched pornography, the types of videos she viewed, whether she searched for pornography the night of the alleged incident, and whether she had ever masturbated. 1T. at 377-379. V.M. denied those activities. Thus, Vicario was able to present his theory of fabrication and to challenge V.M.'s credibility before the jury.

**Harmless Error Analysis**

{¶70}  Assuming for the sake of argument that the trial court erred by excluding the specific search history, any error was harmless. Under Crim.R. 52(A), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." The State bears the burden of demonstrating that an error did not affect the

defendant's substantial rights. *State v. Perry*, 2004-Ohio-297, ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741 (1993).

{¶71} Applying this framework, even if the trial court should have admitted the search history, the exclusion did not prejudice Vicario. The defense had ample opportunity to argue fabrication through other means, including cross-examination, expert testimony, and closing argument. Moreover, the State presented overwhelming evidence of guilt, including DNA analysis consistent with Vicario and corroborative testimony regarding his conduct on the day in question.

{¶72} Accordingly, the exclusion of V.M.'s specific pornographic search history did not affect the verdict and, if error at all, was harmless beyond a reasonable doubt.

{¶73} Vicario's first assignment of error is overruled.

II.

{¶74} In his second assignment of error, Vicario contends the trial court committed error by permitting testimony from a state witness, Sierra Sammons, a licensed social worker and forensic interviewer at NCH, in violation of Crim.R. 16(K). We disagree.

**Standard of Review – Admissibility of Evidence**

{¶75} A trial court enjoys broad discretion in determining the admissibility of evidence, provided its rulings comply with procedural and evidentiary rules. *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991). Even when a trial court abuses its discretion, reversal is warranted only if the error affects a substantial right or results in a miscarriage of justice.

*O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165 (1980); *Beard v. Meridia Huron Hosp.*, 2005-Ohio-4787, ¶ 20. However, evidentiary rulings that implicate a defendant's constitutional rights, such as the right to confrontation, are reviewed de novo. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010); *State v. McKelton*, 2016-Ohio-5735, ¶ 97; *State v. Anthony*, 2021-Ohio-1916, ¶ 25 (5th Dist.).

**Crim.R. 16(K)**

{¶76}  Crim.R. 16(K) requires that any party intending to call an expert witness must produce a written report summarizing the expert's findings, analysis, or opinions at least twenty-one days before trial. *State v. Boaston*, 2020-Ohio-1061, ¶ 46. The rule is mandatory and self-executing: "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." Crim.R. 16(K).

{¶77}  Vicario maintains that, although Sammons testified as a lay witness, the trial court improperly allowed her to discuss the concept of "accidental disclosure" in child sexual abuse cases, including how such disclosures occur and how they differ from intentional disclosures. Accordingly, the threshold question is whether Sammons' testimony constituted expert opinion within the meaning of the rule, or whether it was properly admissible as lay opinion under Evid.R. 701.

**The Disputed Testimony**

{¶78}  At trial, Sammons testified,

Q. What is an accidental disclosure?

A.  Yeah. Yeah. An accidental disclosure would be something that is unintentionally disclosed by a child. This can happen in a number of ways,

but it wasn't something that they intended to talk about or have explained or told to someone.

Q. Okay. And what is purposeful?

A. A purposeful disclosure is something that they intentionally disclosed to someone.

…

Q. Why was a medical forensic interview done?

A. So there was a concern that Mom had walked in on Stepdad straddling [V.M.].

Q. Is that an accidental disclosure?

A. Yes.

Q. Can you explain a little bit about that?

A. So because [V.M.] did not intentionally tell anyone about this, and someone walked in on something happening, that would be accidental because it was unintentional.

3T. at 446, 449.

{¶79} According to Vicario, this testimony required specialized training and experience in child psychology and sexual abuse dynamics. As such, he contends Sammons effectively offered expert testimony, which triggered the State's obligation under Crim.R. 16(K) to produce a written expert report prior to trial. Because no such report was provided, Vicario asserts the trial court should have excluded Sammons' testimony concerning accidental disclosures.

**{¶80}** The State responded that Sammons' testimony was permissible lay opinion under Evid.R. 701, as it was based on her personal perceptions and relevant to the understanding of presented evidence.

**Evid.R. 701- Opinion testimony by lay witnesses**

**{¶81}** Under Evid.R. 701, a lay witness may offer opinion testimony only if it is (1) rationally based on the witness's perception and (2) helpful to a clear understanding of a fact in issue.

**{¶82}** Evid.R. 702 governs testimony by experts and states, in pertinent part: "[a] witness may testify as an expert if the proponent demonstrates to the court that it is more likely than not that all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by laypersons or dispels a misconception among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> ***

**{¶83}** To be sure, the distinction between fact and opinion can often be murky. While expert opinion is based on knowledge that only specialists in a particular field can master, Ohio law and rules of evidence permit layperson opinion where the opinion is based on personal knowledge and is helpful to the trier of fact. *State v. McKee*, 91 Ohio St.3d 292, 296 (2001). The Supreme Court of Ohio has emphasized that Evid.R. 701 permits lay witnesses to express opinions in areas where expertise might otherwise be

expected provided the testimony stems from personal experience rather than technical or scientific analysis. *Id.* at 296-297.

**Analysis**

{¶84} Applying these principles, we find no violation of Crim.R. 16(K). Nothing in Sammons' testimony reflects expert analysis or conclusions concerning the psychology of "accidental disclosure" in child sexual abuse cases. Rather, her statements merely described the sequence of events and her understanding of what occurred in this case - that the disclosure was unintentional because V.M.'s mother walked in while the incident was occurring.

{¶85} Moreover, Sammons' statements were cumulative of other properly admitted testimony. Both V.M. and her mother testified that the disclosure occurred because the mother walked in while the abuse was happening. Detective Simon's testimony also corroborated the same facts. Sammons' brief characterization of that sequence as "accidental" added no new substantive information, nor did it invite the jury to draw any psychological inferences.

{¶86} Because Sammons' testimony was based on her personal observations and assisted the jury in understanding the evidence, it fell squarely within the parameters of Evid.R. 701. As such, the trial court acted within its discretion in admitting the testimony.

**Harmless Error**

{¶87} Assuming for the sake of argument that Sammons' testimony constituted expert opinion subject to Crim.R. 16(K), any error in its admission was harmless beyond a reasonable doubt. See *State v. Boaston*, 2020-Ohio-1061, ¶ 58; *State v. Brook*, 2024-Ohio-3074, ¶ 71 (5th Dist.).

{¶88} In assessing harmless error, courts apply the three-part test articulated in *State v. Harris*, 2015-Ohio-166, ¶ 37: (1) whether the error prejudiced the defendant, (2) whether it was harmless beyond a reasonable doubt, and (3) whether, after removing the disputed evidence, the remaining evidence establishes guilt beyond a reasonable doubt. *See also Boaston*, ¶ 63; *Brook*, ¶ 72; *State v. Roman-Navarre*, 2025-Ohio-3156, ¶ 117 (5th Dist.).

{¶89} Here, the testimony concerning "accidental disclosure" was cumulative of other admissible evidence. The jury heard substantially the same facts from multiple witnesses: that V.M.'s mother walked in while the abuse occurred; that V.M. was taken for a forensic interview later that evening; and that V.M. initially minimized her disclosure. Thus, even if Sammons' statements had been excluded, the remaining evidence overwhelmingly supported the same conclusion, i.e., V.M.'s initial disclosure followed an accidental discovery of the abuse by her mother. Any error in admitting the testimony was therefore harmless beyond a reasonable doubt. *See State v. Aeschilmann*, 2014-Ohio-4462, ¶¶ 95-96 (5th Dist.).

{¶90} Accordingly, Vicario's second assignment of error is overruled.

III.

{¶91} In his third assignment of error, Vicario argues that the trial court erred in excluding portions of the testimony from the defense expert witness, Dr. Robert Stinson, concerning statistical percentages of false allegations in child sexual abuse cases because the expert did not provide citations for this information in his report. We disagree.

**Standard of Review – Admissibility of Evidence**

**{¶92}** A trial court is afforded broad discretion in determining the admissibility of evidence, so long as its rulings comport with procedural and evidentiary rules. *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991). Even where an abuse of discretion is found, reversal is warranted only when the ruling affects a substantial right or results in a miscarriage of justice. *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165 (1980); *Beard v. Meridia Huron Hosp.,* 2005-Ohio-4787, ¶ 20. By contrast, evidentiary rulings that implicate a defendant's constitutional rights - including the right to confrontation or the right to present witnesses in one's own defense - are reviewed de novo. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010); *State v. McKelton*, 2016-Ohio-5735, ¶ 97; *State v. Anthony*, 2021-Ohio-1916, ¶ 25 (5th Dist.).

**{¶93}** Vicario argues the exclusion here rose to the level of a constitutional violation because it curtailed his ability to present a complete defense.

**Background**

**{¶94}** The defense called Dr. Robert Stinson, a licensed forensic psychologist, to testify at trial. Per Crim.R. 16(K), Stinson created a 125-page report prior to trial, which summarized his findings, conclusions, and reasoning. But when he began discussing the frequency and causes of false sexual abuse allegations, the State objected,

> [The State]: I'm going to object to any statistics about false allegations because these statistics about false allegations are widely broad and not cited whatsoever in that report.

> [The Court]: [Reading from Dr. Stinson's report]: Most studies indicate that about 10 percent of sexual abuse allegations are false allegations.

[Defense Counsel]: Further down, it says - -

[The State]: A total of 65 percent has no citations, 10 percent has- -

[The Court]: Yeah. If they don't have cites, she [the prosecutor] can't check them.

…

[The State]: I'm going to be crossing on that. But to actually throw out that statistic that 2 to 65 percent is just…I intend to cross him on this, but I'm asking about those stat numbers that are not supported.

[The Court]: You're talking about just the 2 to 65?

[The State]: All the stat numbers in there.

[The Court]: Yeah.  I mean, in my mind, expert reports need to have some support…I think the objection is sustained.

4T. at 852-853.


**Right to Present a Complete Defense**

{¶95}  The right to present a defense is a fundamental component of a fair trial. *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973). This principle ensures "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). However, this right is not absolute. States retain authority to impose evidentiary rules to exclude material that is unreliable or lacks a sufficient foundation, so long as the restriction is not "arbitrary" or "disproportionate to the purposes they are designed to serve." *United*

*States v. Scheffer*, 523 U.S. 303, 308-309 (1998), citing *Rock v. Arkansas*, 483 U.S. 44, 56-58 (1987); *State v. Wesson*, 2013-Ohio-4575, ¶ 59.

**Crim.R. 16(K)**

{¶96} Crim.R. 16(K) provides,

(K) Expert Witnesses; Reports. An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

The federal counterpart to Evid.R. 16(K), Fed.R.Crim.P. 26(a), provides,

(2) Disclosure of Expert Testimony.

(A) In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(B) Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or

one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) *the facts or data considered by the witness in forming them;*

(iii) *any exhibits that will be used to summarize or support them*;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.  (Emphasis added).

{¶97} In contrast to the federal rule, nothing within Ohio's rule expressly provides that the written report summarizing the expert witness's testimony detail the authorities relied upon by the expert in forming his or her opinion. *See, e.g., State v. Henderson,* 2017-Ohio-412, ¶53 (6th Dist.) ("Hutchinson and Henderson complain that the state did not provide the medical literature relied on by Dr. Schlievert. But they cite nothing requiring the state to do so, and they cite nothing to show that they ever requested these materials.").

{¶98} Here, the defense expert did not opine that the victim in this case made a false allegation. Instead, the excluded testimony related only to generalized statistical research regarding the incidence of false accusations in child sexual abuse cases. Ordinarily, such material may be admissible under Evid.R. 803(18), the "learned treatise"

exception to the hearsay rule. *Moretz v. Muakkassa*, 137 Ohio St.3d 171, 184 (2013). Evid.R. 803(18) permits the admission of statements from learned treatises during the testimony of expert witnesses. *State v. Henderson*, 2017-Ohio-412, ¶51 (6th Dist.). "If admitted, the statements may be read into evidence but may not be received as exhibits. *Moretz* at 185.

**Harmless Error**

{¶99} Assuming for the sake of argument that the trial court erred in the exclusion of statistical incidence evidence, reversal is unwarranted unless the ruling affected a substantial right. Evid.R. 103(A). Vicario has made no such showing. The defense was permitted to elicit testimony explaining the concept of false allegations in child sexual abuse investigations and the psychological dynamics associated with them; only the unsupported numerical statistics were excluded. Moreover, as discussed in connection with the sixth and seventh assignments of error, the State presented overwhelming evidence of guilt. *See State v. Williams*, 6 Ohio St.3d 281 (1983), paragraph six of the syllabus; *State v. Gilmore*, 28 Ohio St.3d 190, 193 (1986); *State v. Conway*, 2006-Ohio-791, ¶ 123.

{¶100} Accordingly, because Vicario has failed to demonstrate that the exclusion of statistical evidence affected the outcome of the trial, or impaired his ability to present a meaningful defense, the third assignment of error is overruled.

IV.

{¶101} In his fourth assignment of error, Vicario asserts that the trial court erred by admitting portions of V.M.'s statements made during the April 4, 2024, forensic interview conducted by Jami Casto, arguing that the statements were improperly admitted under

Evid.R. 803(4) as being for medical diagnosis or treatment. Vicario also argues the admission of these statements violated the Confrontation Clause because V.M. did not repeat them during her in-court testimony. We disagree.

**Background**

{¶102} Two separate forensic interviews of V.M. occurred in this case. The first, on November 4, 2023, concerned the allegations against Vicario and immediately preceded the PSANE examination and the collection of medical and DNA evidence. A second forensic interview occurred on April 4, 2024, after a separate allegation was reported involving another individual. During that second interview, after discussing the unrelated allegation, Casto asked V.M.: "Is there something that you didn't tell that person that you talked to before about your stepdad that you do remember?" 4T. at 709. V.M. then stated allegations against Vicario, describing vaginal and anal penetration. *Id.* at 707, 711-712.

{¶103} The defense filed a motion in limine to exclude the April 4th statements. The trial court conducted voir dire of Casto and ultimately ruled that the statements were admissible under Evid.R. 803(4) as statements made for purposes of medical diagnosis or treatment.  4T. at 698-699.

**Confrontation Clause**

{¶104} The Sixth Amendment to the United States Constitution protects the right of a criminal defendant "to be confronted with the witnesses against him." The "primary object" of this provision is to prevent unchallenged testimony from being used to convict an accused - a safeguard that applies to both federal and state prosecutions. *Mattox v. United States*, 156 U.S. 237, 242 (1895); *Crawford v. Washington*, 541 U.S. 36, 42, (2004). The provision encompasses the rights to have a witness physically appear in the

courtroom, to require the witness to testify under oath, and to force the witness to be subject to cross-examination. *See Maryland v. Craig*, 497 U.S. 836, 845-846 (1990).

{¶105} In *State v. Perez*, the defendant was convicted of aggravated murder with two death penalty specifications. 2009-Ohio-6179, ¶ 54. During trial, the State introduced recorded conversations between Perez and his wife through the testimony of a detective rather than during the wife's testimony. Perez objected, arguing that the tapes constituted hearsay that could be introduced only while the declarant herself was on the stand. The trial court overruled the objection. *Id.* at ¶ 125. On appeal, Perez claimed that this procedure violated his Sixth Amendment right to confront the witness because he could not cross-examine his wife "in real time" about her recorded statements. *Id*. at ¶ 126.

{¶106} The Supreme Court of Ohio rejected that argument, holding that Perez's "confrontation claim lacks merit." *Id.* at ¶ 127. Citing *Crawford* and longstanding Confrontation Clause jurisprudence, the Court held:

> "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. * * * The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford v. Washington*, 541 U.S. 36, 59 fn. 9 (2004), *citing California v. Green*, 399 U.S. 149, 162 (1970). *See also State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 110.

2009-Ohio-6169, ¶141. The Court further emphasized that Evid.R. 611(B) permits cross-examination on "all relevant matters," not merely those raised during direct examination, and Perez could have questioned his wife about the tapes when she testified, regardless

of which witness physically introduced the recordings. *Id.* at ¶¶ 141-142. Thus, there was no Confrontation Clause violation because the declarant was present and available for cross-examination. *Id.*

{¶107} The same reasoning controls here. The defense was on notice of the interview's contents before trial. V.M. testified at trial and was subject to unrestricted cross-examination. Nothing prevented Vicario from questioning her about the April 4, 2024, forensic interview, nor did Vicario request to recall V.M. once Casto later described the interview. As in *Perez,* the Confrontation Clause does not require that testimonial hearsay be introduced through the declarant herself; it requires only that the declarant be available for cross-examination. Because V.M. testified and Vicario had the opportunity to confront her, no confrontation clause violation occurred.

**The Confrontation Clause and Hearsay Exceptions.**

{¶108} Having determined that the statements made during the forensic interview are not barred by the Confrontation Clause, we must also now decide whether the statement was admissible under our rules of evidence. *State v. Jones*, 2012-Ohio-5677, ¶ 165.  *See also State v. Davis,* 2024-Ohio-1504, ¶ 29 (5th Dist.); *State v. Paskins,* 2022-Ohio-3810, ¶ 43 (5th Dist.); *State v. Simon,* 2021-Ohio-2738, ¶ 19 (5th Dist.).

**Hearsay and the Medical-Purpose Exception**

{¶109} Hearsay is, in essence, secondhand testimony: an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C). Hearsay is ordinarily inadmissible because it lacks reliability safeguards inherent in in-court testimony. Evid.R.

801(C), 802; *State v. Steffen*, 31 Ohio St.3d 111, 119 (1987). Evid.R. 803(4), however, permits the admission of statements made for purposes of medical diagnosis or treatment. The rationale is that reliable medical care depends on truthful disclosure of symptoms, history, and mechanism of injury. *See White v. Illinois*, 502 U.S. 346, 356-357 (1992).

**The *Arnold* Framework**

{¶110} In *State v. Arnold*, 2010-Ohio-2742, the Supreme Court of Ohio held that statements made during forensic interviews at child-advocacy centers may serve dual purposes - both investigative and medical. Statements serving a primarily medical purpose are non-testimonial and admissible under Evid.R. 803(4); statements serving an investigative or prosecutorial purpose are testimonial and inadmissible under the rule. *Id.* at ¶¶ 33-38, 42-43.

{¶111} The analysis is fact-specific and focuses on the primary purpose of the particular statement. *State v. Remy*, 2018-Ohio-2856, ¶ 82; *State v. Jones*, 2015-Ohio-4116, ¶ 73.

**Application to the Present Case**

{¶112} Here, the evidence established that the forensic interview of November 4, 2023, involved the allegations related to Vicario. Moreover, additional evidence arising from the interview was admitted, including the PSANE examination, medical evidence, and DNA evidence collected based upon V.M.'s disclosures made during that interview.

{¶113} Unlike in the November 2023 interview, there were no facts that the April 2024 interview triggered or supported any medical examination, treatment plan, or clinical assessment concerning Vicario's alleged conduct. The only medical information

associated with the April 2024 interview concerned a separate perpetrator. Casto acknowledged that she did not know whether any medical provider performed treatment based on the April 2024 statements implicating Vicario, nor did she make any medical referrals based on those statements. 4T. at 684, 690. No testimony or evidence was admitted explaining how physical evidence of an alleged rape that occurred November 4, 2023, could be obtained from an examination conducted five months later, after a second incident of sexual abuse occurred that did not involve Vicario.

{¶114} Moreover, the challenged statements were elicited not as part of an intake assessment but through a directed, investigative question posed after nearly one hour of discussion regarding a different alleged offender. 4T. at 687. Under *Arnold*, such circumstances support the conclusion that the primary purpose of these statements was forensic, not medical.

{¶115} Accordingly, V.M.'s April 4, 2024, statements concerning Vicario were not properly admissible under Evid.R. 803(4).

**Harmless Error**

{¶116} Even assuming error, reversal is unwarranted if the admission of the statements did not materially affect the verdict. *See State v. Harris*, 2015-Ohio-166, ¶ 37. After excising the April 4, 2024, statements, the remaining evidence, including V.M.'s testimony, the first forensic interview, the PSANE examination, and DNA findings independently establishes guilt beyond a reasonable doubt. See *State v. Aeschilmann*, 2014-Ohio-4462, ¶¶ 95-96.

{¶117}  Accordingly, Vicario's fourth assignment of error is overruled.

V.

**{¶118}** In his fifth assignment of error, Vicario contends the trial court improperly permitted the State to impeach its own witness, Mother, with a prior inconsistent statement without first establishing affirmative damage as required by Evid.R. 607(A). We disagree.

**Background**

**{¶119}** During her initial interview with police on the night of the incident, Mother reported that she entered her daughter's bedroom approximately ten minutes after Vicario left the bedroom he shared with her. 2T. at 304. At trial, however, during cross-examination, Mother testified that she followed Vicario out of the bedroom roughly thirty seconds after he left. 2T. at 274-275, 304, 309.

**{¶120}** On redirect examination, the State questioned her about the earlier ten-minute account, but she responded that she did not recall the duration. 2T. at 294. Outside the presence of the jury, the trial court suggested that the State attempt to refresh her recollection by playing the recording of her prior statement. *Id.* at 296. After listening to the recording, Mother continued to deny recalling the earlier timeline. *Id.* at 297. The court thereafter permitted the State to impeach her with the prior inconsistent statement, finding both surprise and affirmative damage. The court reasoned:

> I think it goes to the very heart of the case as to whether or not this is 30 seconds or ten minutes. I think that's—I mean, it goes directly to defense's argument that there wasn't enough time for this to have occurred.

2T. at 301-302.

**Analysis**

{¶121} Ohio law permits impeachment of a party's own witness by a prior inconsistent statement only upon a showing of both surprise and affirmative damage. Evid.R. 607(A); *State v. Davie*, 80 Ohio St.3d 311, 323 (1997). "Surprise" is established where the witness's testimony is materially inconsistent with a prior statement and counsel had no reason to anticipate the recantation. *State v. Darkenwald*, 2004-Ohio-2693, ¶ 28 (8th Dist.), citing *State v. Stearns*, 7 Ohio App.3d 11 (8th Dist. 1982). The issue of whether a party is surprised by a witness' testimony is a factual one. *State v. Reed,* 65 Ohio St.2d 117, 125 (1981).

{¶122} Here, the record supports the trial court's finding of surprise. Mother's thirty-second timeline was plainly inconsistent with her prior ten-minute statement, and nothing in the record suggests the State had advance notice she would materially alter her account.

{¶123} "Affirmative damage" is likewise established. A witness's testimony causes affirmative damage when it contradicts or undermines the calling party's position. *State v. McCradic*, 2009-Ohio-2592, ¶ 91 (5th Dist.). Based upon the ten-minute timeline, the State alleged that Vicario had sufficient time to commit the offense before Mother entered the bedroom; the defense, by contrast, argued that the thirty-second timeline was insufficient to do so. Thus, the changed timeline was more than a "collateral matter"; rather, the changed timeline struck at the central theory of the prosecution's case and materially benefitted the defense. *See State v. Bourdess*, 1999 Ohio App. LEXIS 4785, *30 (8th Dist. Oct. 7, 1999).

{¶124} Because the record establishes both surprise and affirmative damage, the trial court acted within the bounds of Evid.R. 607(A) in permitting impeachment. No abuse of discretion occurred.

{¶125} Vicario's fifth assignment of error is overruled.

VI.

{¶126} In his sixth assignment of error, Vicario contends that the trial court erred in not granting his Crim. R. 29 motion for acquittal at the conclusion of the state's case. We disagree.

{¶127} When reviewing a trial court's denial of a Crim.R. 29 motion for acquittal, an appellate court considers whether the evidence presented at trial was legally sufficient to sustain the conviction. *State v. Williams*, 74 Ohio St.3d 569, 576 (1996); *State v. Carter*, 72 Ohio St.3d 545, 553 (1995); *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 n.4 (1997); *see also State v. Robertson*, 2022-Ohio-905, ¶ 15 (5th Dist.); *State v. Pearce*, 2017-Ohio-8386, ¶ 11 (5th Dist.) *State v. Stacy*, 2025-Ohio-4491, ¶ 22 (5th Dist.)

**Threshold Issue – Merger of Counts**

{¶128} Before turning to the merits of the sufficiency challenge, we note that two of the challenged convictions - Sexual Battery [Count 2], and Sexual Battery [Count 4] - were allied offenses of similar import and merged into the convictions for Rape [Counts 1 and 3] for purposes of sentencing. Because Vicario received no additional sentence for those counts, any claimed insufficiency as to them is harmless as a matter of law. *State v.*

*Cowan,* 2024-Ohio-2028, ¶ 26 (3d Dist.); *State v. Sheldon*, 2019-Ohio-4123, ¶ 11 (3d Dist.); *State v. Crawford*, 2019-Ohio-2959, ¶ 38 (3d Dist.); *accord State v. Henderson*, 2018-Ohio-5123, ¶ 9 (7th Dist.); *State v. Ramos*, 2016-Ohio-7685, ¶ 14 (8th Dist.); *State v. Smith*, 2009-Ohio-2166, ¶ 27 (10th Dist.); *State v. Mugrage*, 2021-Ohio-4136, ¶ 133 (11th Dist.); *see also State v. Powell*, 49 Ohio St.3d 255, 263 (1990) (merger renders error on merged count harmless beyond a reasonable doubt).

{¶129} Accordingly, the sufficiency inquiry properly focuses on the remaining convictions: rape by force or threat of force and tampering with evidence.

**Rape (R.C. 2907.02(A)(2))**

{¶130} Having narrowed the sufficiency inquiry to the rape convictions, we next determine whether the State presented legally sufficient evidence of force or threat of force and vaginal or anal penetration.

{¶131} R.C. 2907.02(A)(2) prohibits engaging in sexual conduct with another when the offender purposely compels submission by force or threat of force. "Sexual conduct" expressly includes vaginal intercourse, anal intercourse, cunnilingus, and fellatio, and further includes the "insertion, however slight, of any part of the body or any instrument, apparatus, or object into the vaginal or anal opening of another." R.C. 2907.01(A). Penetration, however slight, is sufficient to complete vaginal or anal intercourse. *Id.*

{¶132} The vagina is the hollow passage leading from the uterus of the female body outward to the exterior genitalia, or vulva, which is comprised of lip-like folds of skin called the labia majora. *State v. Remy*, 2018-Ohio-2856, ¶ 26 (2d Dist.); *State v. Patterson,* 2021 Ohio App.LEXIS 2361, *8-*9 (5th Dist. July 12, 2021). Ohio courts have consistently held that penetration is established when the application of force causes the

labia majora to part. *See State v. Carpenter*, 60 Ohio App.3d 104, 105 (5th Dist.1989); *State v. Remy*, 2018-Ohio-2856, ¶ 27 (2d Dist.); *State v. Stacey,* 2009-Ohio-3816, ¶ 16 (3d Dist.); *State v. Melendez*, 2009-Ohio-4425, ¶ 14 (9th Dist.). This interpretation aligns with the statutory amendment replacing "vaginal cavity" with "vaginal opening," thereby dispelling any higher threshold of internal penetration. *See State v. D.H.,* 2018-Ohio-559, ¶ 30 (10th Dist.).

{¶133} The evidence presented at trial, viewed in the light most favorable to the State, established each statutory element. V.M. testified that Vicario entered her bedroom while she was asleep, silently pulled her pajama shorts and underwear down to her calves, rubbed his penis against her vagina, and attempted to insert it. She further testified that he then rubbed his penis against her anus and moved it "in and out," and that the act was "wet and painful." DNA evidence corroborated her testimony in material respects. Y-STR profiles recovered from both the vaginal and anal swabs were consistent with Vicario's paternal lineage. The labia majora swab contained a mixture of DNA consistent with both Vicario and the minor victim. Acid phosphatase testing was positive on multiple anatomical sites consistent with contact and transfer from Vicario.

{¶134} Thus, both testimonial evidence and forensic evidence independently support a finding of penetration.

**Force or Threat of Force**

{¶135} The evidence likewise supports the element of force. Force may be established by any physical compulsion that overcomes the victim's will, and the amount required varies with the age of the victim and relationship to the offender. *State v. Eskridge*, 38 Ohio St.3d 56, 58-59 (1988). Where the victim is a child and the perpetrator

stands in a parental or quasi-parental role, the Supreme Court of Ohio has recognized the inherent coercive force of authority. *State v. Dye*, 82 Ohio St.3d 323, 327 (1998); *Eskridge, supra*.

{¶136} The evidence presented during Vicario's jury trial established that he is married to the victim's mother, and living as a family with the mother and her two daughters.

{¶137} Here, the victim was a minor under Vicario's authority in the household. At trial, V.M. testified the assault took place without her consent while she pretended to sleep. The record established that Vicario physically manipulated V.M.'s body, removed her clothing while she pretended to remain asleep, and positioned himself to facilitate the assault.

{¶138} We find these facts sufficient to demonstrate Vicario used force against his minor stepdaughter, who pretended to be asleep, in order to compel her submission. *State v. Lauderdale*, 2024-Ohio-481, ¶ 35 (2d Dist.); *State v. Stevens*, 2016-Ohio-446, ¶ 27-28 (3d Dist.); *State v. Burton*, 2007-Ohio-1660, ¶ 42 (4th Dist.); *State v. Green*, 2002-Ohio-3949, ¶ 61 (5th Dist.); *State v. Artis*, 2021-Ohio-2965, ¶95 (6th Dist.); *State v. Walker*, 2011-Ohio-6645, ¶ 20 (8th Dist.); *State v. H.H.*, 2011-Ohio-6660, ¶ 12 (10th Dist.).

{¶139} Taken as a whole, the testimony of the child victim, the corroborating physical and forensic evidence, and the inherent coercive parental authority sufficed to prove the element of force beyond a reasonable doubt.

{¶140} Accordingly, viewing the evidence under the proper standard, a rational trier of fact could conclude that each element of vaginal and anal rape under R.C.

2907.02(A)(2) was proven. The sufficiency challenge as to the rape convictions therefore fails.

### Tampering with Evidence (R.C. 2921.12(A)(1))

{¶141} We next address Vicario's sufficiency challenge to his conviction for tampering with evidence. R.C. 2921.12(A)(1) prohibits a person, "knowing that an official proceeding or investigation is in progress or is about to be or likely to be instituted," from altering, destroying, concealing, or removing evidence "with purpose to impair its value or availability" in such investigation or proceeding.

To secure a conviction under this statute, the State was required to prove:

1). knowledge that an investigation was ongoing or likely to be instituted;

2). concealment, destruction, alteration, or removal of potential evidence; and,

3). a purpose to impair the evidentiary value or availability of that item.

*See State v. Straley*, 2014-Ohio-2139, ¶ 11.

### 1. Knowledge of Likely Investigation

{¶142} Knowledge may be inferred from circumstantial evidence, including the nature of the underlying offense and the surrounding circumstances. *Straley; State v. Johnson,* 56 Ohio St.2d 35, 38 (1978). Although the Supreme Court of Ohio has rejected constructive knowledge based solely on the commission of a crime, *see State v. Barry*, 2015-Ohio-5449, the Court has also expressly recognized that when a crime is of the type that is inherently likely to be reported or discovered, knowledge of an impending

investigation may be inferred. *State v. Martin*, 2017-Ohio-7556, ¶ 118. Knowledge that a criminal investigation is imminent is based upon a reasonable person standard. *State v. Workman,* 2015-Ohio-5049, ¶ 51 (3d Dist.); *State v. Keck*, 2025-Ohio-2647, ¶ 16 (5th Dist.).

{¶143} Unlike the simple drug possession at issue in *Barry*[6], a sexual assault of a minor living in the same household is a crime almost certain to be disclosed and investigated. A reasonable trier of fact could infer that Vicario reasonably understood this and acted accordingly.

### 2. Removal and Concealment of Evidence

{¶144} The trial evidence demonstrated that a bottle of lubricant - normally kept in the master bedroom - was found in the minor victim's bedroom immediately after the assault. Before police arrived, the bottle disappeared. Officers later recovered it concealed in a trashcan in the adjoining master bathroom. When first questioned, Vicario denied moving or disposing of the bottle. Only after further confrontation did he admit he had discarded it.

{¶145} These actions constitute removal and concealment of physical evidence directly associated with the underlying offense, satisfying the second element of tampering.

### 3. Purpose to Impair Availability

{¶146} Purpose, like knowledge, may be inferred from conduct. Disposing of the lubricant in the bathroom trashcan, coupled with Vicario's initial denial of having touched

---

[6] *Barry* was a heroin possession and tampering case where it was alleged that the defendant concealed heroin in a body cavity. However, the court found that when the defendant concealed the heroin, she had no reason to believe that the police would investigate her, therefore she could not be found guilty of the tampering charge.

or moved it, reasonably supports the conclusion that he acted with the intent to prevent its discovery or evidentiary use. *See State v. Thompson*, 2023-Ohio-2942, ¶ 34 ("purpose may be established where the circumstances demonstrate an attempt to prevent law enforcement from locating incriminating evidence").

**Conclusion**

{¶147} The State presented legally sufficient evidence from which a rational trier of fact could conclude beyond a reasonable doubt that Vicario knew an investigation was likely to be instituted and removed the lubricant from the victim's bedroom for the purpose of impairing its availability as evidence. His tampering conviction is therefore supported by sufficient evidence.

{¶148} Accordingly, Vicario's sixth assignment of error is overruled.

VII.

{¶149} In his seventh assignment of error, Vicario contends that his convictions are against the manifest weight of the evidence. We disagree.

**Standard of Review – Manifest Weight of the Evidence**

{¶150} The standard of manifest weight of the evidence concerns the persuasiveness of the evidence presented at trial. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. A conviction may be reversed on manifest weight grounds only in "the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 n.4 (1997)*; *State v. Martin,*

2022-Ohio-4175, ¶ 26. In evaluating a manifest weight claim, an appellate court sits as the "thirteenth juror," independently reviewing the entire record, weighing the evidence and all reasonable inferences, and assessing witness credibility. *State v. Jordan*, 2023-Ohio-3800, ¶ 17; *State v. Sheppard*, 2025-Ohio-2747, ¶ 24 (5th Dist.).

{¶151} Deference to the jury's determinations of credibility, demeanor, and the resolution of evidentiary conflicts is strongly presumed. *Eastley*, ¶ 21; *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). The jury may believe all, part, or none of a witness's testimony. *State v. Raver*, 2003-Ohio-958, ¶ 21. Inconsistencies or circumstantial evidence do not, by themselves, render a verdict against the manifest weight of the evidence. *State v. Craig*, 1999 WL 29752 (10th Dist. Mar. 23, 2000); *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991).

**Application to Vicario's Case**

{¶152} Here, the record reflects that both V.M. and Vicario testified and were subject to extensive cross-examination. The jury observed their demeanor, tone, and credibility firsthand. In addition, the State presented corroborating evidence, including DNA and Y-STR analyses, forensic interviews, and testimony from Mother, who interrupted the assault, all of which reinforced V.M.'s account. Viewed in its entirety, the evidence demonstrates Vicario's guilt beyond a reasonable doubt and reflects a logical and credible basis for the jury's verdict.

{¶153} Having conducted a thorough independent review of the record as the "thirteenth juror," we find no compelling reason to conclude that the jury lost its way or

that a manifest miscarriage of justice occurred. The weight of the credible evidence clearly supports the convictions.

**Cumulative Error**

{¶154} Vicario additionally references the doctrine of cumulative error in his brief. (Appellant's brief at 24). The State did not respond to Vicario's cumulative error suggestion.

{¶155} App.R. 16(A)(3) requires that assignments of error be specifically set forth and supported by citations to the record, as appellate review is conducted on the merits of the assignments of error presented. *JP Morgan Chase Bank, N.A. v. Cloyes*, 2021-Ohio-3316, ¶ 10 (10th Dist.); *Aaron v. Sup. Ct.,* 2024-Ohio-5616, ¶ 9 (10th Dist.). "'This court rules on assignments of error, not mere arguments.'" *Hamid v. Univ. Manors, Ltd.*, 2021-Ohio-2115, ¶ 16 (10th Dist.), quoting *Huntington Natl. Bank v. Burda*, 2009-Ohio-1752, ¶ 21 (10th Dist.), citing App.R. 12(A)(1)(b); *Cloyes*, 2021-Ohio-3316 at ¶ 10.

{¶156} Absent a separately assigned error, this Court has no basis to consider arguments of cumulative error. *See Hamid*, ¶ 16; *Ward v. Ward*, 2021-Ohio-2571, ¶ 6 (10th Dist.). Because Vicario did not separately assign cumulative error, and the State did not address it, we decline to consider this argument.

{¶157} For the foregoing reasons, Vicario's seventh assignment of error is without merit and is overruled.

For the reasons stated in our Opinion, the judgment of the Delaware County Court of Common Pleas is affirmed. Costs to Appellant, Steven M. Vicario.